**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YE ZHOU, Individually and On Behalf of All Others Similarly Situated, <br><br>                             Plaintiff, <br><br>     v. <br><br> NEXTCURE, INC., MICHAEL RICHMAN, STEVEN P. COBOURN, KEVIN N. HELLER, M.D., DAVID KABAKOFF, PH.D., ELAINE V. JONES, PH.D., CHAU Q. KHUONG, JUDITH J. LI, BRIGGS MORRISON, M.D., TIM SHANNON, M.D., STEPHEN WEBSTER, STELLA XU, MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., PIPER JAFFRAY & CO., NEEDHAM & COMPANY, LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INC., and BTIG, LLC, <br><br>                           Defendants. | Case No. 1:20-cv-07772-LTS-RWL |

**PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

# **Table of Contents**

**NATURE OF THE ACTION** ........................................................................ 1

**PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934** . 7

    I    Jurisdiction and Venue ............................................................. 7

    II   The Exchange Act Parties ......................................................... 7

    III  NextCure's FIND-IO Platform, NC318 and Phase 1/2 Clinical Trial ........... 10

    IV  Defendants False and Misleading Statements and Omissions...................... 13

    V   The Undisclosed Adverse Facts About Find-Io, Nc318 and The Phase 1/2
        Clinical Trial Emerge ............................................................. 27

    VI  Claims For Relief Under The Exchange Act ................................... 32

**PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933** ..................... 33

    VII  Jurisdiction and Venue ........................................................... 34

    VIII The Securities Act Parties ....................................................... 35

    IX   Nextcure's Defective IPO ....................................................... 43

    X    NextCure's Defective Secondary Offering .................................... 53

    XI   Material Omissions in the Company's Offering Documents in
        Violation of Applicable Regulations ........................................... 57

    XII  Claims For Relief Under The Securities Act .................................. 58

**CLASS ACTION ALLEGATIONS** ............................................................ 62

**PRAYER FOR RELIEF** ........................................................................ 64

**JURY DEMAND** ................................................................................ 65

Lead Plaintiff Ye Zhou ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants NextCure, Inc. ("NextCure" or the "Company"), certain directors and officers of the Company, and the underwriters of NextCure's initial public offering ("IPO") and secondary offering ("SPO") (collectively, "Defendants"), alleges the following based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by the Company, the Company's press releases and earning conference call transcripts, and analyst and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all those who purchased or otherwise acquired shares of NextCure common stock between May 8, 2019 and July 13, 2020, inclusive (the "Class Period"), including all those who purchased such shares pursuant or traceable to NextCure's May 8, 2019 IPO and those who purchased shares pursuant or traceable to NextCure's November 14, 2019 SPO.  This suit seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 ("Securities Act") for materially false, misleading and/or incomplete statements made (and related material omissions committed) during the Class Period.

2.      Throughout the Class Period, Defendants represented that NextCure had a unique, ground breaking platform for developing new cancer treatments and that its first treatment candidate, NC318, had strong results to date and had a clear path forward to move toward approval. The truth was that (i) NextCure had misappropriated much of its technology from a competitor

1

and (ii) the trial data for NC318, as well as the trial that generated it, were highly problematic and the likelihood of achieving meaningful results was very low. Defendants used these misrepresentations to significantly boost the stock price of NextCure so that they could raise $172.2 million in a secondary offering.

3.     NextCure is a clinical-stage biopharmaceutical company that strives to discover and develop immune-oncology therapies. At all relevant times, NextCure repeatedly touted its "novel," "unique" and "proprietary" FIND-IO discovery platform, crediting it for being the means through which NextCure "identified multiple novel targets," including the immunosuppressive properties of Siglec-15, or S15, the target of NextCure's most advanced and significant treatment candidate, NC318, and the central pillar of the Company's multi-year collaboration agreement with Eli Lilly & Co. ("Lilly"), the sole source of *any* revenues recognized by the Company. Thus, FIND-IO was, at all relevant times, critically important to the Company and the market's assessment of the Company's value.

4.     Contrary to the Company's numerous public statements, however, FIND-IO was not "unique," "novel," or "proprietary." Nor, was it "developed…based on the immunological expertise of [NextCure's] management team." Rather, as the market eventually learned following the close of NextCure's public offerings, which collectively garnered over $258 million from the investing public, FIND-IO was built upon misappropriated confidential information and know-how from a direct competitor, Immunaccel Labs ("Immunaccel"). What is more, unbeknownst to investors, NextCure's CEO, Defendant Michael Richman ("Richman"), had direct knowledge of this misconduct as he, himself, served on the Board of Managers of Immunaccel until late-2019.

5.      Also critical to the Company and the market's assessment of NextCure's value was NextCure's leading treatment candidate, NC318.   NC318 was *the only[1]* product candidate from NextCure to reach clinical testing.   Defendants repeatedly touted NC318's potential to treat multiple cancer indications, including those in patients who were not responding to current FDA-approved cancer therapies offered by others like Opdivo (from Bristol-Myers Squibb) and Keytruda (from Merck & Co.).

6.      At all relevant times, NextCure was actively engaged in NC318's Phase 1/2 Clinical Trial.  The trial was an "open-label," "first-in-human trial," designed to assess the safety and tolerability of NC318, to define the maximum dose or pharmacologically active dose and to assess preliminary efficacy.  NextCure "designed this clinical trial with a robust biomarker strategy *to help evaluate clinical activity throughout the trial*" and initially evaluated NC18 for the treatment of advanced or metastatic solid tumors, which included ovarian cancer, Non-Small Cell Lung Cancer ("NSCLC"), and head and neck squamous cell carcinoma, among others.

7.      During the months that preceded the start of the Class Period, including at the time of the IPO, NextCure possessed (and routinely received updated) data from the Phase 1 dose-escalation portion of its Phase 1/2 Clinical Trial.  With these results in hand (and immediately prior to conducting the Company's secondary public offering in November 2019), Defendants selectively – and misleadingly – released those aspects of the data that were *positive* for the Company and NC318, in an effort to advance their narrative that NC318 was effective across a range of tumor types, while withholding those aspects of the trial data that were *negative*.

8.      In particular, on November 5, 2019, in an abstract issued through the Society of Immunotherapy of Cancer ("SITC") (the "Abstract"), NextCure represented that 43 patients,

---

[1] Unless otherwise noted, internal citations are omitted and emphasis is added to quoted materials.

including 10 NSCLC and 7 ovarian patients, had been dosed across 6 cohorts (8mg – 800mg) every two weeks. Of these 43 patients, 32 were evaluable for efficacy, including 7 patients in the NSCLC cohort. The Abstract only featured the "single agent activity" observed in these 7 NSCLC patients, stating how NextCure saw "1 CR [complete response], a PR [partial response], 1 stable disease with tumor reduction, and 2 with stable disease," which resulted in an observed response ratio ("ORR") of 27% and a disease control rate ("DCR") of 71%. Notably, NextCure provided neither details about what it observed in the remaining 25 evaluable patients, nor the makeup of the remaining 11 patients who had not yet reached their first assessment. NextCure concluded by stating that "NC318 has been well tolerated across multiple dose levels and has shown encouraging anti-tumor activity when administered as monotherapy.... [as] observed in 5 of 7 NSCLC subjects' refractory to PD-1 therapies." On this news, NextCure's stock price skyrocketed, increasing nearly 250% to close at $92.22 – representing a staggering $65.79 per share gain compared to its closing price of $26.43 on the previous trading day.

9.     The truth was that by November 5, 2019, NextCure had a significant amount of additional negative data undercutting these representations of efficacy. Three additional NSCLC patients had been evaluated without showing any positive results. As a result, among patients in the NSCLC cohort, NextCure reported that the ORR fell from 27% to 15% and that the DRR fell from 71% to 46%. On this news, NextCure's shares gave back more than half of the gains it experienced when the Abstract was released, falling $43.87 (53%) to $39.02.

10.    Undeterred by its updated results, NextCure continued to advance it narrative about NC318's promise. Defendant Kevin Heller ("Heller"), NextCure's Chief Medical Officer ("CMO"), for example, was "***encourage[ed] to see single-agent activity among NSCLC patients,***" was confident that "***the results to date support the potential of NC318***[,]" and characterized the

4

NC318 data as "show[ing] some *very encouraging promise*." Similarly, Defendant Richman credited "*initial anti-tumor activity with NC318*" for "reinforce[ing] [NextCure's] belief that *NC318 has the potential* to be a new therapy for patients with solid tumors and low levels of PD-L1 expression or who do not response to current anti-PD-1/PD-L1 treatments[,]" and recognized these findings for "revalidate[ing] the importance of [NextCure's] FIND-IO discovery platform."

11.     Reflecting this continued pumping, NextCure stock remained 41% above what it traded at before the Abstract was published. The Company, a mere three days later, capitalized on its inflated stock price by making available over 4 million shares of NextCure common stock at an offering price of $36.75 per share. The resulting secondary offering raised approximately $172.2 million in gross proceeds for the Company.

12.     But the truth was that the small sample size of the study, the heterogeneity of the patients, and the relatively low response rates from the study from the first part of the trial, among other infirmities, boded poorly for NC318 and the prospects of being able to progress toward approval. Indeed, in July 2020, largely based on the same data from the Phase 1 portion of its Phase 1/2 Clinical Trial, the Company abandoned the Phase 2 part of the trial for NC318 for NSCLC, the most commercially significant market, and for ovarian.

13.     On this news, the price of NextCure's stock *fell over $9.70 per share – equal to a decline of more than 54%* - on a single day, falling from $17.88 per share on July 10, 2020 to close at only $8.15 per share on July 13, 2020, the next trading day. This decline also reflected an overall collapse *of 91%* from the stock's Class Period high of $92.22 on February 5, 2019, of *nearly 78%* from NextCure's $36.75 per share Secondary Offering Price, and *of nearly 46%* from NextCure's $15.00 per share Initial Offering Price.

14.    As a result of Defendants' wrongful acts and omissions as alleged herein, Plaintiff and the members of the Class (defined below) purchased NextCure common stock at artificially inflated prices and suffered losses as the full truth about NextCure's FIND-IO platform and NC318 began to be revealed.

15.    Plaintiff, on behalf of herself and the Class she seeks to represent, now brings this suit to recover the losses she has suffered as a result of Defendants' materially false, misleading, and incomplete statements.

**The Claims Asserted in this Complaint**

16.    As set forth below, Plaintiff asserts two separate sets of claims.  Counts I and II, as set forth in Part One of this Complaint, assert securities fraud claims under §§10(b) and 20(a) of the Exchange Act.  These claims are asserted against Defendants NextCure, Richman, Steven P. Cobourn ("Cobourn"), and Heller (collectively, the "Exchange Act Defendants").  These claims specifically incorporate all allegations and inferences from the facts alleged that the Exchange Act Defendants made the materially false, misleading, and incomplete statements and omissions alleged herein with scienter (i.e., intentionally or recklessly), in violation of §10(b) and Rule 10b-5 promulgated thereunder, and that the Individual Exchange Act Defendants are also liable under Count Two as control persons under §20(a).

17.    Counts III and IV, set forth in Part Two of this Complaint, assert strict liability and negligence claims under §§11 and 15 of the Securities Act, in connection with NextCure's IPO and SPO.  The non-fraud claims under §11 are asserted against NextCure (as issuer), the Individual Securities Act Defendants (defined below), all of whom signed the defective Offering Documents for the IPO and the SPO, and each underwriter of NextCure's IPO and SPO.  In addition, the Individual Securities Act Defendants are named as "control person" defendants under §15 of the Securities Act.

18.     Plaintiff specifically disclaims any allegations of fraud, or fraudulent intent, in the separately pleaded non-fraud Securities Act claims asserted in Counts III and IV, with the proviso that any challenged statements of opinion or belief, made in connection with the Offering Documents, are alleged to have been actionable and materially inaccurate, misleading, or incomplete statements of opinion or belief as of the date of each offering.

**PART ONE:**
**CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**I.      JURISDICTION AND VENUE**

19.     The claims asserted in Part One arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

20.     This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

21.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, certain Defendants reside and/or transact business in this District, and NextCure's stock trades on the NASDAQ, which is located in this District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and facilities of the national exchange.

**II.     THE EXCHANGE ACT PARTIES**

23.     Plaintiff purchased NextCure common stock during the Class Period and in connection with the Company's IPO, as set forth in the certification filed herewith, and was

damaged thereby. In addition, Plaintiff has been assigned the claims of her husband, Sucai Bi ("Bi"). Mr. Bi's relevant trades are similarly reflected in the certification filed herewith. Mr. Bi was damaged when the true facts about the Company's business, financial condition and operations were disclosed and the artificial inflation was removed from the price of NextCure's stock.

24.    Defendant NextCure is a clinical-stage biopharmaceutical company incorporated under the laws of the state of Delaware and maintains its principal executive offices in Beltsville, Maryland. NextCure's common stock trades on the NASDAQ, which is an efficient market located in New York, NY, under the ticker symbol "NXTC." NextCure held its initial public offering in May 2019.

25.    Defendant Richman was, throughout the Class Period and at all relevant times, President and CEO of NextCure. Defendant Richman also served as a director on the Company's Board. Defendant Richman reviewed, approved, and participated in making the Company's public statements. He also reviewed, edited, and approved the IPO and SPO road show PowerPoint presentations, road show talking points and scripts, and participated in making the materially inaccurate misleading and incomplete statements alleged herein as NextCure's CEO.

26.    Defendant Cobourn was, throughout the Class Period and at all relevant times, CFO of NextCure. Defendant Cobourn reviewed, approved, and participated in in making the Company's public statements. He also reviewed, edited, and approved the IPO and SPO road show PowerPoint presentations, road show talking points and script, and participated in making the materially inaccurate misleading and incomplete statements alleged herein as NextCure's CFO.

27.    Defendant Heller was, throughout the Class Period and at all relevant times until his resignation on July 13, 2020 (effective August 4, 2020), CMO of NextCure. Defendant Heller

oversaw the NC318 Phase 1/2 Clinical Trial and made various relevant statements during the Class Period.    Defendant Heller reviewed, approved, and participated in in making the Company's public statements.

28.    Defendants Richman, Cobourn, and Heller are sometimes collectively referred to herein as the "Officer Defendants."

29.    During the Class Period, the Officer Defendants ran the Company as hands-on executives and/or managers, overseeing NextCure's operations, finances, and business.    The Officer Defendants made the materially false and misleading statements described herein and each had intimate knowledge about core aspects of NextCure's financial and business operations.    The Officer Defendants were also intimately involved in deciding which disclosures would be made by NextCure.    Because of their positions and access to material non-public information available to them during the Class Period, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

30.    The Officer Defendants, because of their positions at NextCure, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, institutional and individual investors, and industry experts and/or practitioners at conferences and other events.    The Officer Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

31.     NextCure and the Officer Defendants made, or caused to be made, materially false, misleading, and incomplete statements that caused the price of NextCure's common stock to be artificially inflated during the Class Period.

## III.   NEXTCURE'S FIND-IO PLATFORM, NC318 AND PHASE 1/2 CLINICAL TRIAL

32.     The advancement of cancer to late stages indicates a failure of a person's immune system to mount an effective anti-tumor immune response.  NextCure aims to discover and develop immunomedicines that use new or unique mechanisms of action to treat cancer and other immune-related diseases by restoring normal immune function.  In other words, NextCure strives to produce cancer immunotherapy that restores an impaired immune system to a healthy state by detecting and killing cancerous cells while avoiding harming healthy cells in the process.

### A.  NextCure's FIND-IO Platform

33.     NextCure's approach to identifying targets for new immunomedicines is based on its FIND-IO platform, which "applies a function-based screening approach to identify human proteins and to determine whether those proteins alter or stop an immune response resulting in immune evasion."

34.     According to Defendants, the platform was developed by NextCure Co-founder Lipeing Chen, Ph.D. ("Dr. Chen"), Professor of Immunobiology at Yale University, and an early pioneer of cancer immunotherapy.  Dr. Chen has been credited with discovering B7-H1 (now more widely known as PD-L1, or programmed cell death protein ligand 1), and for realizing that blocking the interaction between PD-1 and PD-L1 with monoclonal antibodies improved the immune system's ability to eliminate tumors.  Dr. Chen also discovered the immunosuppressive properties of S15, the target of NextCure's lead product candidate, NC318, using a predecessor of NextCure's FIND-IO platform.

35.     Since its founding in 2015, NextCure purports to have further developed, industrialized and optimized its FIND-IO platform through "the immunological expertise of [its] management team and the scientific leadership of Dr. Chen," as well as other institutional "***immunology knowledge, experience[,] capacities and tools.***"  NextCure also represents that the platform "uses ***our proprietary approaches*** to functionally assess immune pathways in both primary immune cells and established cell lines from immune lineages, including T cell subsets, monocytes, macrophage subpopulations, dendritic cells, cancer cell lines and cells isolated from diseased patients[,]" and that the Company has experienced success in "identify[ing] multiple novel targets using [the] FIND-IO platform."

36.     At all relevant times, NextCure's FIND-IO platform was critically important to the Company and the market's assessment of the Company's value.  Indeed, NextCure's FIND-IO platform was the sole driver behind a November 2018 multi-year collaboration agreement entered into between NextCure and Lilly (the "Lilly Agreement"), pursuant to which NextCure was to use its FIND-IO platform to identify novel oncology targets for additional collaborative research and drug discovery by NextCure and Lilly.  Under the Lilly Agreement, NextCure granted Lilly the exclusive option to obtain worldwide exclusive licenses to research, development, manufacture and commercialize multiple compounds and products directed at oncology targets identified through the collaboration.  The Lilly Agreement called for a joint steering committee, formed by an equal number of members from each party, to meet regularly, and resulted in NextCure receiving an upfront payment of $25 million in cash and a $15 million equity investment, among other quarterly research and development support payments and milestone payments in an aggregate of up to $1.4 billion.

### B.   NextCure's Leading Treatment Candidate: NC318

37.     As mentioned above, the immunosuppressive properties of S15 was discovered in Dr. Chen's lab using a predecessor to the FIND-IO platform.  In preclinical research, NextCure and others observed that S15 promotes suppression of T cell proliferation and negatively regulates T cell function.  NextCure's NC318 was designed to block this S15-mediated immune suppression and restore T cell function and anti-tumor immunity in the tumor microenvironment, or TME, which NextCure believed would reduce and kill tumors.

38.     Since S15 is expressed in multiple tumor types and has a unique ability to modulate immune responses, NextCure also believed NC318 had the potential to treat multiple cancer indications.  More significantly, because S15 and PD-L1 expression in tumors appeared generally to be non-overlapping, NextCure expected NC318 to improve outcomes for the estimated 60%-70% of cancer patients who fail to respond to existing cancer therapies targeting PD-1/PD-L1, including blockbuster drugs like Merck's Keytruda and Bristol-Myers Squibb's Opdivo.

39.     Thus, NC318 became (and at all relevant times remained) NextCure's most promising and critical, lead product candidate.

### C.   NextCure's Phase 1/2 NC318 Clinical Trial

40.     In October 2018, NextCure initiated the first-in-human trial for NC318.

41.     Phase 1 of this Phase 1/2, Open-Label, Dose-Escalation, Safety and Tolerability Study of NC318 in Subjects with Advanced or Metastatic Solid Tumors (the "Phase 1 Study"), sought to assess NC318 in patients suffering from Head and Neck Squamous Cell Carcinoma, NSCLC, Ovarian Cancer, and Triple Negative Breast Cancer, among others afflictions.

42.     This was an "open label" study. Unlike double-blinded studies where study participants and researchers do not know which treatment the patient is receiving, "open-label" studies, like the Phase 1 Study, enable the study participants and researchers (here, NextCure) to

know which treatment the patient is receiving *and* the outcomes of that treatment *during and throughout the course of the study*.

43.     As for objectives, the Phase 1 Study was designed to assess the safety and tolerability of NC318, to define the maximal tolerable dose (MTD) or pharmacologically active dose of NC318, and to assess preliminary efficacy.  NextCure utilized a "3+3 design"[2] in the hopes of determining the MTD of NC318, and dosed patients every 2 weeks.

44.     As of March 31, 2019, NextCure dosed 21 patients across four dose cohorts, and reported NC318 as being "well tolerated," with no drug-related severe adverse events or dose limiting toxicities observed.[3]  Of these 21 patients, 13 were evaluable for efficacy, meaning they had at least one "on-treatment" radiologic assessment.  NextCure observed ***one patient with a confirmed partial response***, six patients with stable disease and six patients with disease progression.  The Company noted, "[t]he patient with the confirmed partial response was a ***lung cancer*** patient in the 8mg cohort."

## IV.     DEFENDANTS FALSE AND MISLEADING STATEMENTS AND OMISSIONS

45.     According to the IPO Offering Documents, NextCure's "approach to the discovery of targets using [its "***proprietary***"] FIND-IO platform is ***novel***[,]" and predicated on NextCure's use of its purported "***immunology knowledge, experience, capabilities and tools [ ] developed***" over time.  Indeed, according to Defendants, since its founding NextCure has "developed, industrialized and optimized [its] FIND-IO platform ***based on*** the immunological expertise of [its] management team and the scientific leadership of [its] scientific founder, Dr. Lieping Chen."

---

[2]     A traditional 3+3 design proceeds with cohorts of three patients; the first cohort is treated at a starting dose that is considered to be safe based on extrapolation from animal toxicological data, and the subsequent cohorts are treated at increasing dose levels that have been fixed in advance.

[3]     *See* Current Report on Form 8-K filed with the SEC on August 8, 2019.

46.     As for how NextCure created the platform, the IPO Offering Documents state:

Our approach in creating the FIND-IO platform, and how we apply it, reflects our belief in the importance of understanding biological pathways of all cells in the immune system and restoring normal immune function. The platform uses ***our proprietary approaches*** to assess the suppressive or stimulatory function of immune pathways in T cells and other immune cells, as measured by effects on proliferation or induction of molecules known to impact immune responses, such as cytokines, which are signaling molecules secreted by cells in the immune system that mediate and regulate immunity and inflammation. We study primary immune cells from healthy donors and from patients with various diseases, as well as established cell lines from immune and non-immune cell lineages, including T cell subsets, monocytes, macrophage subpopulations and cancer cell lines. In oncology, we are using the FIND-IO platform to discover immunomedicines with the potential to intervene or modulate interactions of immune cells within the TME to restore anti-tumor activity.

*       *       *

***Our FIND-IO platform is the result of our industrialization, expansion and optimization of a predecessor platform*** that Dr. Chen used to discover the immunosuppressive properties of S15. Our FIND-IO platform applies a function-based screening approach to identify human proteins and to determine whether those proteins alter or stop an immune response resulting in immune evasion.

*       *       *

***To create our FIND-IO platform, we industrialized, expanded and optimized the T Cell Activity Array, or the TCAA, a predecessor of the FIND-IO platform that Dr. Chen used to discover the immunosuppressive properties of S15. Our work in developing the FIND-IO platform beyond the TCAA includes using different and expanded gene libraries, adding biological pathways and reporters, expanding immune cell types and, most importantly, increasing the repertoire of functional assay readouts***. We also broadened the platform to look at signaling within both the immune cell and the cell expressing the library gene. By transfecting cells with library genes, which encode membrane-bound or soluble proteins, FIND-IO is designed to determine whether the genes have signaling functions when interacting with an immune cell.

*       *       *

Our FIND-IO technology includes ***proprietary approaches*** to functionally assess immune pathways in both primary immune cells and established cell lines from immune lineages, including T cell subsets, monocytes, macrophage subpopulations, dendritic cells, cancer cell lines and cells isolated from diseased patients.

14

47.     The foregoing statements were false and misleading because NextCure's FIND-IO platform was built upon the confidential information and know-how of Immunaccel, a direct competitor, not upon NextCure's "immunology knowledge, experience, capabilities [or] tools." Indeed, in 2013, approximately *two years before* he co-founded NextCure with Dr. Chen, Defendant Richman was recruited to assist in building Immunaccel, which provided a "three-dimensional platform designed to study the tumor microenvironment in cancer research." In 2016, while serving on the Board of Managers of Immunaccel—*a position he held until 2019*—Defendant Richman arranged for NextCure to become a customer of Immunaccel because of their "mutual focus on immune-oncology and Immunaccel's 3D technology." The two companies entered into a Contract Services Agreement and Defendant Richman, in his capacity as NextCure's CEO, began receiving confidential information regarding Immunaccel's 3D assays and its 3D platform, which, he then used to enable NextCure to develop its own platform, effectively copying Immunaccel's 3D technology, and market itself in direct competition. Thus, *at the time of NextCure's IPO*, its FIND-IO platform was not "proprietary" or "novel." Nor was it simply created by just some "***industrialization, expansion and optimization of [the] predecessor platform***" Dr. Chen used to discover the immunosuppressive properties of S15. Rather, it was based on misappropriated confidential (i.e., unoriginal) information, expertise and know-how from a separate competing entity.

48.     According to the Abstract NextCure released on November 5, 2019 before the market opened, 43 patients had been dosed with NC318 across six dose cohorts (8mg-800mg, every two weeks) in advanced solid tumors, including 10 NSCLC, 7 ovarian, 6 melanoma, 3 breast and 3 CRC patients. NC318 had been well tolerated and tumor responses were evaluable in 32 patients with single agent activity seen in NSCLC patients, in particular, including one who

achieved complete remission (a/k/a "a complete response"), another who experienced tumor shrinkage (a/k/a "a partial response") and three whose disease appeared not to have worsened. Accordingly, with 2 of 7 NSCLC patients experiencing a significant change, NextCure observed a "29% overall response rate (ORR)," and reported an "overall disease control rate (DCR) of 71%."

49.    These statements were false and misleading because they created a positive impression of NC318's effectiveness—best evidenced by the responding surge of nearly 250% of NextCure's stock price—when, in fact, NextCure possessed additional information that seriously undercut the representation of efficacy.  Specifically, at the time of the misstatement, NextCure had data on each of the remaining 25 evaluable patients, including information about what cancer cohort they belong to and whether their diseases had progressed while being treated with NC318. Among these 25 evaluable patients were three additional NSCLC patients, all of whom showed no positive results from their NC318 treatment.  Consequently, among patients with NSCLC, NextCure's ORR was not 27%, but really 15%, and its DCR was not 71% but rather 46%.  These declines, in what was NextCure's most enrolled and promising patient population, which also happened to be its largest market opportunity, were significant because they undercut the Company's narrative about NC318's promise *as purportedly seen by* the meaningful responses observed in the two NSCLC patients the Abstract featured—a narrative that analysts and the media celebrated when the Abstract was published.  For example, on November 5, 2019, Piper Jaffray issued a report reiterating its overweight rating and its price target of $54 per share, explaining how it "***remained impressed by the early monotherapy activity seen***," and viewed the "***early monotherapy activity***…to be ***compelling***, and ***supportive*** that NC318 is active in PD-(L)1 relapse/refractory ***NSCLC patients representing a large market opportunity***."  Similarly, an article published on *The Motley Fool* characterized the two responses out of the group of seven

lung cancer patients evaluated as a "***great result***[,]" it recalled how "[t]he stock took off like a rocket [] ***when investors learned that one patient achieved complete remission, another experienced tumor shrinkage, and three more haven't gotten any worse***[,]" and it noted that "expectations for NextCure and NC318 [ ] soar[ed] because S15-positive tumors tend to be PD-L1-negative, and NC318 could become as popular as [Merck's blockbuster drug] Keytruda if ***clinical trial results continue to impress.***"   Thus, information calling into question the effectiveness of NC318 in NSCLC patients, in particular, including that three additional patients saw no benefits from the treatment, would have materially marred the story told.

50.     In the wake of NextCure's disclosure regarding the additional trial data, Defendants continued to mislead investors regarding the meaning of the trial results and the likelihood that NextCure would be able to demonstrate effectiveness.  In a November 9, 2019 press release, Defendant Heller stated that he was "***encourag[ed] to see single-agent activity among NSCLC patients'*** refractory to PD-1 therapies, including a durable complete response and a durable partial response[,]" and was confident that "***the results to date support the potential of NC318*** to block S15-mediated immune suppression among a patient population unlikely to respond to PD-1/PD-L1-directed therapies."  Likewise, Defendant Richman credited "***initial anti-tumor activity with NC318***" for "reinforce[ing] [NextCure's] belief that ***NC318 has the potential*** to be a new therapy for patients with solid tumors and low levels of PD-L1 expression or who do not response to current anti-PD-1/PD-L1 treatments."

51.     Defendant Heller continued to hype the trial data and likelihood of demonstrating efficacy during a November 9, 2019 analyst call, stating in relevant part:

> NC318, I believe has shown some ***very encouraging promise*** here as a single agent activity. We would not and we have not expected to see any clinical responses in PD-1 refractory patients. But we were fortunate enough to have two that were

confirmed with deepening and improving responses along the way. Stable disease was observed for greater than six months in multiple other tumor types.

*      *      *

***We also are of course very encouraged by the confirmed responses in non-small cell lung***, a couple of stable diseases that we saw in ovarian, head and neck, and breast.

Defendant Heller also elected to speak on the design of the Phase 1 Study, which he credited for

providing "very strong" evidence of NC318's promise in PD-1 refractory NSCLC patients:

[I]t was a pretty standard three plus three design. We looked at a wide breadth of dose levels. And one of the things that we did in order to manage efficiency to enroll quickly [while] also trying to get as much data as possible is that we made the biopsies for the first three patients in each dose cohort option[al], which means we didn't very often get biopsies. But then as we backfilled in order to collect additional data, we made those biopsies requirement because we did want to emphasize our commitment to biomarker research.

Eligibility. We really want to point out here that of course this was all comer[s]. This was independent PD-L1 or Siglec-15 status. So we were not optimizing the phase 1 component to look for efficacy. Phase 1, and the objective of phase 1 is all about safety and tolerability and collecting as much data as possible ***so you can make a good educated guess*** for a ***recommended phase 2 <u>dose</u>***.

*      *      *

And then I will have a little bit more discussion regarding the phase 2 plan. But it's a Simon 2-Stage design, subject tumors must be PD-L1 TPS score of less than 50% in our phase 2 component. And the rational for that is because of a non-overlapping expression pattern of PD-L1 and Siglec-15. So it is a means by which we could softly enrich for patients with Siglec-15 expression.

But then what we're going to do is we'll check for Siglec-15 expression retrospectively and we'll stratify as necessary.

And ***part of the reasons we designed it in that manner was that right now we have some preliminary data that suggests very strongly that this is active among patients who have PD-1 refractory non-small cell lung cancer***.

52.    These statements seriously overstated the significance of the trial's results and the

likelihood that NextCure would be able to demonstrate efficacy.   Contrary to Defendant Heller's

claims that the trial had shown "***very encouraging promise***" and that the data "***very strongly***"

18

"*suggests*" efficacy, the reality was that the trial results did not show any meaningful evidence that NC318 was effective because the trial was not designed to or even capable of showing efficacy, while Defendants' statements cherry-picked the limited positive aspects of the data and omitted critical caveats, in particular that the trial's design made it ill-suited to demonstrating efficacy. The likelihood of NextCure ever being able to demonstrate that NC318 had meaningful impact was actually very low.

53.     FDA approval of a drug requires "substantial evidence" of effectiveness from "adequate and well-controlled" trials. *See Food, Drug and Cosmetic Act*, 21 USC 355(d). FDA regulations emphasize the importance of such trials "to distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation." *See Adequate and Well Controlled Studies*, 21 C.F.R. §314.126. At minimum, the NextCure Phase 1/2 study design was not "adequate and well-controlled" for purposes of determining efficacy, because:

- The study's primary and secondary objectives did not include showing efficacy.

- The study did not include a valid control, making the ORR completely uninterpretable;

- The lack of pre-treatment biopsies meant that the study did not enroll only those patients with the disease of interest;

- The study did not include adequate measures to minimize bias on the part of the patients and investigators; such measures include use of a control group and blinding; and

- The study's outcome measurement of tumor response is not well-defined and reliable for assessing efficacy, because it is so easily and significantly affected by investigator biases.

54.     The last deficiency is particularly important. The FDA bases drug approvals on outcomes that represent evidence of clinical benefit, such as improved overall survival (OS). However, the results in the Abstract represented tumor response, which frequently does not translate into clinical benefits such as improved survival.  As the FDA explained in its April 2015 Guidance for Industry: Clinical Trial Endpoints for the Approval of Non-Small Cell Lung Cancer Drugs and Biologics (the "FDA Guidance"),

> "Treatment effects on ORR have not been demonstrated to reliably predict corresponding effects on survival in NSCLC. We consider demonstration of ORR alone to be a surrogate endpoint reasonably likely to predict clinical benefit *only* when the treatment effect size is large and the responses are durable. In these circumstances, ORR has been used as the basis only for accelerated approval for NSCLC.  In other circumstances, such as when clinical trials have shown that ORR correlated with well-documented improvements in patient tumor-related symptoms (e.g., photodynamic therapy for treatment of obstructing endobronchial therapy), ORR has supported regular approval."[4]

55.     When the FDA has relied on ORR for approval of drugs for treatment of NSCLC, the overall response rate has been quite high, ranging from 33% - 66%. (Chen EY, Raghunathan V, Prasad V., *An Overview of Cancer Drugs Approved by the US Food and Drug Administration Based on the Surrogate End Point of Response Rate.* JAMA Intern Med. 2019 Jul 1;179(7):915-921.)  Because the Phase 1 part of the trial was not prospectively designed to demonstrate efficacy, data from the trial could be deemed positive *only* if NC318 demonstrated a high rate of durable responses.  Here, when incorporating all of the trial results, NC318's ORR was only 15% for NSCLC, considerably below the range of ORR's used by FDA to approve drugs for NSCLC,

---

[4] Cited guidance at 3; *See,* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/clinical-trial-endpoints-approval-non-small-cell-lung-cancer-drugs-and-biologics

which was not the type of clear response that would support Defendant Heller's claim that the results were "***very strong***."

56.     Relatedly, the value of the data was further undercut by the small sample size.   With only 10 patients in the NSCLC study, the 95% confidence interval, *i.e.*, the range of possible final outcomes when the study was completed, had a lower bound close to zero, meaning that the study could find that NC318 had no effect at all.   In this regard, NextCure's trial contrasted adversely with the development of immune checkpoint inhibitors such as pembrolizumab (Keytruda), whose Phase 1 studies in previously treated patients with metastatic NSCLC were adequate and well-controlled trials designed to detect clinical efficacy and did in fact show a significant increase in overall survival among all patients randomized, compared to standard therapy. (Keytruda label approved 5/23/17, Section 14.2, Table 19, 31-6)

57.     Defendants' claims were particularly misleading for an additional reason: even the trial's limited positive data was contaminated.   As was later revealed, the two NSCLC patients who supposedly showed complete or partial responses were not biopsied prior to NC318 treatment, meaning NextCure had no idea whether they were part of the patient population for which they would be seeking FDA approval.  This made it "hard to prove that the high overexpression of S15 led to durable responses" in these two NSCLC patients.  In other words, the data was not only not "very strong," but actually discouraging and the Company had already undermined its ability to draw positive conclusions from the few bright spots purportedly observed.   Furthermore, as the FDA Guidance warned, "disease progression and tumor responses" based on "subjective interpretation of radiographic images" have the "potential to introduce bias, particularly when evaluated in open-label trials."

58.     The value of the data was further undercut by the study protocol, which routinely allowed enrollment of patients who had recently received other cancer treatments; patients could be enrolled if they had received chemotherapy at least 15 days before receiving the first dose of NC318, or had received a prior monoclonal antibody at least 29 days before receiving the first dose of NC318.  With the publicly available version of the protocol failing to indicate whether a patient had to have a tumor assessment between receiving previous treatment and NC318, the anti-tumor activity attributed to NC318 could, in fact, actually have been due to prior treatments.

59.     Additionally, the claim that the two NSCLC responses were "durable" was not accurate because not enough time had elapsed to determine whether these responses were in fact durable.  As of September 2019, the duration of the CR was 49 weeks, while the duration of the PR was 24 weeks (Sun, Jingwei et al., *Siglec-15 as an Emerging Target for Next-generation Cancer Immunotherapy,* 27,3 Clinical Cancer Rsch. 680-88 (2021); doi: 10.1158/1078-0432.CCR-19-2925. Epub 2020 Sep 21. PMID: 32958700.)  And, the statements emphasizing the lack of tumor progression among several NSCLC patients who received NC318 were highly misleading because they implied that this was evidence of efficacy, but as the FDA explained in its December 2018 Guidance for Industry: Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics, "Stable disease can reflect the natural history of disease, whereas tumor reduction is a direct therapeutic effect." (Cited guidance at 9).

60.     On November 15, 2019, the Company conducted a secondary offering, raising $172.2 million from the investing public.  The SPO Offering Documents repeated the same "novelty" and "proprietary" claims about NextCure's FIND-IO platform that were included in the IPO Offering Document (*see* ¶¶45-6), continued to tout NC318's promise and "***potential*** to treat

multiple cancer indications" and featured the positive Phase 1 data presented in the Abstract, while

utterly ignoring the corresponding negative results:

> ***Data from the trial indicate activity in multiple tumor types,*** including durable
> stable disease in patients with NSCLC, endometrial cell cancer, ovarian cancer,
> squamous cell carcinoma, Merkel cell cancer and head and neck cancer. ***As of***
> ***November 9, 2019, durable responses observed include one complete response,***
> ***which remains ongoing at 55 weeks, and one partial response, which remains***
> ***ongoing at 28 weeks, both in NSCLC patients, as well as 14 patients with stable***
> ***disease, which remain ongoing for between 16 and 42 weeks. Among those 14***
> ***patients, four patients have NSCLC, with stable disease ongoing for between 16***
> ***and 40 weeks.*** Three NSCLC patients (out of 13 NSCLC patients in total) have not
> been in the study long enough to confirm the status of their disease.

61.     The statements were false and misleading because NextCure's FIND-IO platform

was not "novel," "proprietary," or built based on NextCure's "immunology knowledge,

experience, capabilities [or] tools[,] but rather, on already-available know-how and technologies

that Defendant Richman misappropriated while affiliated with a direct competitor, Immunacel.

More specifically, Immunaccel's 3D assay and 3D technology, which was shared with Defendant

Richman after he joined Immunaccel's Board of Managers and subsequently arranged for

NextCure to become a client of Immunaccel, provided the building blocks upon which NextCure

assembled FIND-IO, and, ultimately, marketed itself in direct competition with Immunaccel. The

statements above were further false and misleading because the responses observed in Phase 1

showed, at minimum, that NC318's efficacy in patients with NSCLC was unlikely (with only 2 of

10 NSCLC patients observing a complete or partial response and less than a handful of others

seeing no meaningful responses), and that its ability to treat other cancers was actually poor given

the lackluster objective responses observed in the majority of cohorts tested (with only 10 out of

49 patients not suffering from NSCLC, seeing stable disease).  As a result, NC318 lacked

"potential." Its application was proving to be limited (if even useful at all) and a significant

realizable risk that NC318 would not be nearly as popular as then-existing FDA-approved

blockbuster drugs like Keytruda and Opdivo existed.  Moreover, the statements above were false and misleading because the small size of the clinical trial and the heterogeneity of the patients tested were incapable of indicating whether NC318 was responsive (and S15 was active) among any patients, including the NSCLC patients tested.

62.     On January 16, 2020, NextCure presented at the JPMorgan Healthcare Conference. Defendant Richman, with Defendants Heller, Cobourn and Mayer attending, continued to highlight the "meaningful responses" from the first phase of the "all-comers" clinical trial in the two NSCLC patients observed:

> And this is a snapshot showing the durability of response as well as the CR and PR that was demonstrated in this trial.

> Looking at the responses a little bit more closely, *NC318 demonstrated single-agent activity.*  We saw durability of responses and stable disease.  We saw immune-related adverse events, but *most importantly was this complete response*. This was in the 56-year-old non-small cell lung cancer woman that had multiple target lesions, 2 in particular at 0 millimeters based on RECIST criteria.  She had 3 prior chemo treatments, then came on [Opdivo].  She progressed, where she saw – where multiple nontarget lesions came into the mix.  And over time, being treated with NC318, those target lesions disappeared and those nontarget lesions also disappeared, which ultimately – she was designated as a CR.

> In similar vein, our PR individual was a 74-year old gentlemen, also non-small cell lung cancer.  He had a PD-L1 TPS score less than 50%, similar to our CR patient. He decided not to go on chemo, but was involved in a Phase 1 clinical trial, looking at a LAG-3, PD-1 combination, ultimately progressed, had 2 big, fairly large target lesions, approximately 2.5 centimeters each.  And during week 16, we saw a significant decrease in those target lesions.

> *So on the conclusions from the Phase I portions of the Phase I/II study of NC318,* we demonstrated that the drug was very well tolerated over multiple dose levels. We saw an adverse event profile consistent with what others have seen in immunotherapies, looking at these immune-related adverse events.  *We have a predictable PK profile efficacy, looking at the CR, the PR and the 3 stable disease in non-small cell lung cancer.  We also saw a stable disease in other tumor types such as endometrial and Merkel.*  And as I mentioned, we initiated the Phase II component of this Phase I/II trial in October of last year.

During the question and answer portion of the presentation, Defendant Heller then unequivocally credited NC318 for the complete response observed, stating in relevant part: "the longer she was on NC318 and the further she was from the last PD-1 dose [ ] significantly supports that **this was a direct result** of NC318."

63.     The statements made by Defendant Heller above were false and misleading because they continued to create a positive impression of NC318's effectiveness when, in fact, he knew the clinical trial data, at best, rendered NC318's efficacy difficult to assess, including in patients suffering from NSCLC.   The statements are misleading for the reasons set forth in ¶¶49; 52-59.

64.     On March 12, 2020, NextCure submitted its 2019 Annual Report on Form 10-K to the SEC, and published a press release, repeating the claims about NC318 having "**the potential**" to treat multiple cancer indications, and being "**well suited**" to treat patients who are not responding to Pd-1/PD-L1 directed cancer therapies, based on the "**positive**" data from the Phase 1 trial, which "**indicate[d] activity in multiple tumor types**."

65.     Again, these statements were false and misleading because, at the time they were made, NextCure had no basis to claim that NC318 had "potential" or was "well-suited" because the data from the Phase 1 clinical trial, which was not intended to demonstrate efficacy, was, in fact, not "positive" when entirely reported, but rather showed lackluster objective responses in the overwhelming majority of patient cohorts tested.  Nevertheless, NextCure's unrelenting campaign to portray NC318 as being capable of achieving activity in multiple tumor types, which repeatedly obfuscated the truth, continued to work, with analysts from SunTrust, for example, maintaining their buy rating and price target of $78.00 because the Annual Report, "**didn't carry any surprises**."

66.     On May 29, 2020, NextCure presented (and issued a press release concerning) its biomarker data and updated clinical results from the Phase 1 portion of its NC318 clinical trial at the 2020 Virtual American Society of Clinical Oncology annual meeting (ASCO), juxtaposing the complete response and partial response touted by NextCure in the Abstract and a quote from Defendant Heller stating that NextCure observed "additional evidence of NC318 activity" based on the "early biomarker data" observed.

67.     These statements were false and misleading because they continued to create the impression that the clinical trial was generating "positive" data that supported the Company's narrative about NC318's wide-application and promise to achieve meaningful responses across the cancer spectrum—an impression JPMorgan adopted when it initiated coverage, claimed, based on Defendants' Phase 1 data, that NC318 "has *the potential* to address multiple big indications," and concluded that "NC-318 could *generate up to $2.1B* in peak risk-adjusted revenues by the end of 2029" in NSCLC alone.  In reality, as stated above, the data NextCure possessed from its Phase 1 trial actually showed that NC3118 achieved lackluster objective responses in the majority of cohorts tested (*i.e.*, 10 out of 49 non NSCLC-patients), indicating that the NC318 application was proving to be limited (if even useful at all), that NC318's efficacy in patients with NSCLC was difficult to assess or even unlikely (with only 2 of 10 NSCLC patients observing a complete or partial response and less than a handful of others seeing no meaningful responses), and that, as a result, there was a significant realizable risk that NC318 would not, indeed, serve as a treatment for patients not responsive to then-existing FDA-approved drugs, like Keytruda and Opdivo.  Moreover, the trial's small sample size, the heterogeneity of the patients, and the "all-comers" nature of the trial, including that NextCure did not require biopsies prior to treatment, meant that results observed could not indicate anything meaningful.  Since the biomarker data collected

26

shared the same properties, and were derived from many of the same patients, it, therefore, could not meaningfully serve as "additional evidence" of NC318 activity.

## V. THE UNDISCLOSED ADVERSE FACTS ABOUT FIND-IO, NC318 AND THE PHASE 1/2 CLINICAL TRIAL EMERGE

68. On January 13, 2020, in a terse current report filed on Form 8-K with the SEC, NextCure quietly announced that Lilly—having entered a multi-year collaboration agreement with NextCure pursuant to which NextCure was to use its FIND-IO platform to identify novel oncology targets for additional collaborative research and drug discovery by NextCure and Lilly—had told the Company on January 10, 2020 that Lilly was terminating its deal with NextCure, effective as of March 3, 2020.  Following this news, NextCure's stock plunged, falling $4.70 per share, or approximately 8.29%, to close at $52.00 per share on January 13, 2020.  Days later, when Defendant Richman failed to address this news during his presentation at the JPMorgan Healthcare Conference on January 16, 2020, NextCure's stock declined again 5.25%.

69. On February 12, 2020, Immunaccel filed a lawsuit in the Delaware Court of Chancery against Defendant Richman, alleging that Defendant Richman breached his contractual obligations with and his fiduciary duty of loyalty to Immunaccel, "of which he is a manager," by "surreptitiously using his access to [ ] confidential business information to advance the business of a direct competitor [i.e., NextCure]."  According to Immunaccel's complaint, Defendant Richman was recruited to assist in building Immunaccel in 2013—approximately 2 years before he co-founded NextCure—and continued to serve on Immunaccel's Board of Managers until 2019. During Defendant Richman's time at Immunaccel, Immunaccel sought to (and did) provide its customers a "unique, proprietary, three-dimensional ("3D") platform designed to study the tumor microenvironment in cancer research."  More specifically, Immunaccel offered "an in vitro three-dimensional organotypic platform useful for monitoring the immune cell-tumor microenvironment

[i.e., "TME"]" for purposes including "drug discovery."   NextCure became a customer of Immunaccel in 2016 because of their "mutual focus [on] immune-oncology and Immunaccel's 3D technology."   The two companies entered into a Contract Services Agreement and Defendant Richman, in his capacity as NextCure's CEO, began receiving confidential information regarding Immunaccel's 3D assays and its 3D platform.   Defendant Richman then used this proprietary information to enable NextCure to develop its own platform, effectively copying Immunaccel's 3D technology, and market itself in direct competition to Immunaccel.   Thus, contrary to NextCure's multiple statements otherwise, it appeared to the market, for the first time, that NextCure's FIND-IO platform was not "unique," "novel," "developed…based on the immunological expertise of [NextCure's] management team," or "proprietary[,]" but, instead, was a copycat of already-existing capabilities of a direct competitor that Defendant Richman was intimately familiar with and whose confidential information and know-how were misappropriated by Defendant Richman.

70.     On May 29, 2020, NextCure presented its poster at the 2020 ASCO meeting.   In response, on June 1, 2020, JMP Securities captured, for the first time, management's stated concerns with the clinical trial (and its data), including that, "most of the data presented at the conference is preliminary and immature *due to the heterogeneity of the patient population and lack of systemic collection*[,]" and because "the analysis was performed *with whatever materials available* from the patients enrolled into the Phase 1 portion [of] the trial."

71.     For their part, analysts also began to question the size and design of the clinical trial.   For example, Benchmark downgraded its rating to Hold on June 1, 2020, citing, in part, "inconclusive biomarker data…presented as ASCO" and explaining that "it is complicated to draw any conclusions because *only 15/49 patients* have been biopsied, and [the] two NSCLC patients

that showed fairly durable CR and PR responses (82 weeks and 54 weeks) do not appear to be biopsied *prior to* NC318 treatment." In other words, Benchmark concluded, "*it is hard to prove that the high overexpression of S15 led to durable responses*" in the two NSCLC patients. NextCure's stock closed on June 2, 2020 at $28.69, down $4.51, or 13.58%, from its May 28, 2020 close of $33.20 per share, before falling even lower as the market continued to absorb this information.

72.     Then, pre-market open, on July 13, 2020, in a press release entitled, "NextCure provides an Interim update of the Phase 2 Portion of the NC318 Monotherapy Phase 1/2 Trial and Announces Departure [of its] Chief Medical Officer," Defendant Richman made a shocking admission: "the *monotherapy data* in the NSCLC and ovarian cancer cohorts [was] *disappointing*." As a result, according to the press release, the Company was no longer planning to "*advance the non-small cell lung cancer (NSCLC) and ovarian cancer cohorts in the stage 2 portion of the Simon 2-stage trial*," citing "*clinical response data*" and "current enrollment criteria," and, further, that Defendant Heller "resigned, effective August 4, 2020 to pursue a new opportunity."

73.     Analysts immediately slashed price targets and conveyed concerns. For example, Roth Capital downgraded its rating to neutral from buy and adjusted its price target to just $15 from $80. SunTrust, which had previously lauded the Company and NC318's application in the NSCLC patient population (*see supra*), cut its rating to hold and reduced is price target to $13 from $78, before bluntly stating how "*the probabilities of [NextCure's] efforts developing lead program NC318 monotherapy in NSCLC & ovarian cancer [are now] 0%.*" And, Morgan Stanley downgraded their outlook from overweight to equal weight, set a price target of $11 per share (down from $54) and stated, "*the recent failure, lack of clarity on timetable moving*

*forward, and the recent departure of the CMO Kevin Heller [ ] creat[es] major uncertainty on*

*the potential value of the stock."*

74.     Piper Sandler, which decreased their price target to $32 from $87, quantified the

impact of NextCure's admission, noting that its price target was now based on a lower projected

enterprise value of $663 million, **down from $2.15 billion,** having previously valued NC318 in

NSCLC at $1.49 billion.

75.     Benchmark offered yet another view, connecting the two events revealed in the

Company's July 13, 2020 press release:

> We think the two events are connected. NSCLC was the only indication that
> previously showed clinical responses, and our main investment thesis was around
> the large PD-L1-refactory NSCLC patient population. Indeed, we suspect there
> might have been certain disagreements between the CMO [Defendant Heller] and
> [ ] management in terms of the clinical trial strategy for NC318.

76.     Similarly, JMP Securities, which lowered its rating to market perform, set a price

target of $55 and stated, "The company's decision to stop enrolling in the NSCLC and ovarian

cohorts was based on Simon's two-stage design of the trial and the **lack of any objective responses**

**at the end of 'stage one**.'"  JMP Securities noted further that it "did not get any additional detail

in regards to how many patients were evaluated from [its] subsequent conversation with

management."

77.     NextCure fared no better in the eyes of the media.  For example, on July 13, 2020,

an article published on *Scrip,* which is a website dedicated to covering the biopharmaceutical

markets, entitled "Early Promise of NextCure's Novel IO Candidate Continues to Fade," captured

NextCure's announcement (and history) as follows:

> NextCure, Inc. got off to a strong start, with the best-performing initial public
> offering in the US in 2019 and rising to six times its initial stock price in November
> based on two responses in lung cancer patients treated with NC318, its novel
> immune-oncology candidate.  However, the company's value has sunk based on

updates since then, including a 13 July announcement that it will not advance the NSCLC and ovarian cancer cohorts of an ongoing Phase I/II clinical trial into the Phase II portion of the study.

Beltsville, MD-based NextCure said it made that decision based on current enrollment criteria and clinical response data *in its all-comer study*.

\*       \*       \*

NextCure's value peaked at $92.50 per share on 5 November *when it previewed interim results* that would be presented at the Society of Immunotherapy of Cancer (SITC) conference from the Phase I portion of its Phase I/II study.

\*       \*       \*

However, NextCure's stock fell to $39.02 a few days later after the actual SITC presentation, where Biomedtracker noted that *the only confirmed responses were the single CR and PR reported previously*…

\*       \*       \*

*The enrollment of NSCLC patients in the Phase II portion of the Phase I/II study was highly anticipated to see if treatment of greater numbers of lung cancer patients could generate additional responses, but now NextCure does not believe it has Phase I data that make Phase II testing worthwhile under the current trial's enrollment criteria.*

78.     On this news, NextCure's shares, which had closed at $17.88 per share on July 10, 2020, *dropped over 54%* the next trading day to close at $8.15 per share on July 13, 2020, on unusually high trading volume.  This decrease in the price of NextCure's securities was a result of the artificial inflation caused by Defendants' false and misleading statements coming out of the price.



79.     On July 14, 2020, *Evaluate Vantage* published an article entitled "NextCure's flash in the pan fizzles out," concisely summarizing the "actual" narrative:

> A glimpse of promise from NextCure's anti-Siglec 15 antibody, NC318, briefly pushed the company's valuation over $2bn last year, though this was quickly erased by an underwhelming SITC presentation.  This detailed only two responses in 49 subjects across a range of tumor types, and was followed by an ASCO update that contained no additional signs of efficacy.  ***Yesterday came the inevitable: work in NSCLC and ovarian cancers will cease, NextCure said,*** although head and neck and triple-negative breast cancer cohorts will continue enrolling, with a new partial response seen in the former.  ***But this is unquestionably bad news***: Kevin Heller, the company's chief medical officer, is out.  ***Failure to find single-agent activity is a big red flag with novel immune-oncology mechanisms, as investors have painfully learned several times over, and its seems extremely unlikely that NC318 is going anywhere.  Still, a dearth of evidence did not prevent NextCure from floating at $15 per share in May 2019, and then raising $150m in November at $36.75 – the stock is currently trading at $8.***

## VI.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Exchange Act Defendants

80.     Plaintiff incorporates ¶¶1-79 by reference.

81.     During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentation and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a)     employed devises, schemes, and artifices to defraud;

> (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)       engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of NextCure common stock during the Class Period.

83.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NextCure common stock.  Plaintiff and the Class would not have purchased NextCure common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

84.      As a direct and proximate results of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of NextCure common stock during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against All Exchange Act Defendants**

85.      Plaintiff incorporates ¶¶1-84 by reference.

86.      During the Class Period, the Officer Defendants acted as controlling persons of NextCure within the meaning of §20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about NextCure, the Officer Defendants had the power and ability to control the actions of NextCure and its employees.  In addition, NextCure controlled the Officer Defendants and its other officers and employees.  By reason of such conduct and control, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PART TWO:**
**CLAIMS UNDER THE SECURITIES ACT OF 1933**

87.      In this Part Two and Counts III and IV below (the "Securities Act Claims"), Plaintiff asserts strict-liability and negligence claims under §§11 and 15 of the Securities Act.

Plaintiff incorporates the above factual allegations by reference, but expressly disclaims any allegations of scienter or fraud for these Securities Act claims.  Among other things, Plaintiff disclaims the allegations of scienter or fraud in Part One above.

88.     The Securities Act Claims arise out of NextCure's approximately $86.25 million initial public offering of 5,750,000 shares of its common stock at $15.00 per share, and its $172.2 million November 15, 2019 secondary public offering of over 4 million shares of its common stock at $36.75 per share.

89.     This action was brought within one year of the discovery of the untrue statements and omissions in the Offering Documents (and within one year after discovery should have been made in the exercise of reasonable diligence) and within three years of each offering.

## VII.   JURISDICTION AND VENUE

90.     The claims asserted in this Part Two of the Complaint arise under §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k,77l, 77o).

91.     This Court has jurisdiction over these claims under §22 of the Securities Act (15 U.S.C. §77v).

92.     Venue is proper in this Judicial District under §22 of the Securities Act (15 U.S.C. §77v(a)).  Many of the acts and transactions alleged in this Part Two of the Complaint, including the dissemination of materially untrue and misleading statements, occurred in substantial part in this District.

93.     In connection with the acts, conduct, and other wrongs alleged in this Part II of the Complain, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate wire and telephone communications, and facilities of the NASDAQ, a national securities exchange.

## VIII.     THE SECURITIES ACT PARTIES

### A.  The Securities Act Plaintiff

94.     Plaintiff Zhou (and her non-party husband, Bi) purchased NextCure common stock pursuant or traceable to the Offering Documents and was damaged thereby.

### B.  The Securities Act Defendants

#### 1.   The Company

95.     Defendant NextCure is a clinical-stage biopharmaceutical company incorporated under the law of the state of Delaware and maintains its headquarters at 9000 Virginia Manor Road, Suite 200, Beltsville, Maryland 20705.   NextCure's common stock is listed on the NASDAQ, which is an efficient market located in New York, New York, under the ticker symbol "NXTC."

#### 2.   The Individual Securities Act Defendants

96.     At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Richman was serving as President and CEO of NextCure.  Defendant Richman also served as a director on the Company's Board.  Defendant Richman reviewed, approved, and participated in making statements in both the IPO Registration Statement and in the SPO Registration Statement, each of which he signed.  He also reviewed, edited, and approved the road show PowerPoint presentations, road show talking points, and road show scripts used to shop the IPO and SPO, and participated in making the materially inaccurate misleading and incomplete statements alleged herein as NextCure's CEO.

97.     At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Cobourn was serving as CFO of NextCure.  Defendant Cobourn reviewed, approved, and participated in making statements in the IPO Registration Statement and in the SPO Registration Statement, each of which he signed.  He also reviewed, edited, and approved the road

show PowerPoint presentations, road show talking points, and road show scripts used to shop the IPO and SPO, and participated in making the materially inaccurate misleading and incomplete statements alleged herein as NextCure's CFO.

98.     At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant David Kabakoff, Ph.D. ("Kabakoff") was serving as Chairman of the NextCure Board.  Defendant Kabakoff participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

99.     At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Elaine V. Jones, Ph.D. ("Jones") was serving as a director on the NextCure Board.  Defendant Jones participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

100.     At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Chau Q. Khuong ("Khuong") was serving as a director on the NextCure Board.  Defendant Khuong participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

101.     At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Judith J. Li ("Li") was serving as a director on the NextCure Board.  Defendant Li participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

102.     At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Briggs Morrison, M.D. ("Morrison") was serving as a director on the NextCure Board.  Defendant Morrison participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

103.    At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Timothy M. Shannon, M.D. ("Shannon") was serving as a director on the NextCure Board.  Defendant Shannon participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

104.    At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Stephen W. Webster ("Webster") was serving as a director on the NextCure Board.  Defendant Webster participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

105.    At the time of the IPO and at all relevant times thereafter, including at the time of the SPO, Defendant Stella Xu ("Xu") was serving as a director on the NextCure Board.  Defendant Xu participated in the preparation of and signed, or authorized the signing of, the Offering Documents.

106.    Defendants Richman, Cobourn, Kabakoff, Jones, Khuong, Li, Morrison, Shannon, Webster, and Xu are collectively referred to herein as the "Individual Securities Act Defendants."

### 3.  The Underwriter Defendants

107.    The Underwriter Defendants were also instrumental in soliciting investors and in making the NextCure shares that were offered and sold in or traceable to the IPO and SPO available to the members of the Securities Act Class.

#### i.  The IPO Underwriter Defendants

108.    The table below lists each of the IPO Underwriter Defendants, together with the number of allotted shares that each sold to the Securities Act class members in the IPO:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 2,075,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 1,925,000 |

| Piper Jaffray & Co. | 1,000,000 |
|---|---|

109.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete offering documents.  Morgan Stanley acted as a representative of all the underwriters.  Morgan Stanley also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Morgan Stanley's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Morgan Stanley conducts business and maintains offices in New York, New York.

110.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete offering documents.  Merrill Lynch acted as a representative of all the underwriters.  Merrill Lynch also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Merrill Lynch's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Merrill Lynch conducts business and maintains offices in New York, New York

111.    Defendant Piper Jaffray was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete offering documents.  Piper Jaffray acted as a representative of all the underwriters.  Piper Jaffray also participated in conducting and promoting the roadshow

for the IPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Piper Jaffray's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Piper Jaffray conducts business and maintains offices in New York, New York.

### ii.     The SPO Underwriter Defendants

112.     The table below lists each of the SPO Underwriter Defendants, together with the number of allotted shares that each sold to the Securities Act Class members in the SPO:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 1,549,332 |
| BofA Securities, Inc. | 1,386,245 |
| Piper Jaffray & Co. | 733,895 |
| Needham & Company, LLC | 203,860 |
| BTIG, LLC | 203,860 |

113.     Defendant Morgan Stanley was an underwriter of the Company's SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete offering documents.  Morgan Stanley acted as a representative of all the underwriters.  Morgan Stanley also participated in conducting and promoting the roadshow for the SPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Morgan Stanley's participation in and its solicitation of offers in connection with the SPO was motivated by its financial interests.  Defendant Morgan Stanley conducts business and maintains offices in New York, New York.

114.     Defendant BofA Securities, Inc. ("BofA") was an underwriter of the Company's SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

Company's material inaccurate, misleading, and incomplete offering documents.  BofA acted as a representative of all the underwriters.  BofA also participated in conducting and promoting the roadshow for the SPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.  BofA's participation in and its solicitation of offers in connection with the SPO was motivated by its financial interests.  Defendant BofA conducts business and maintains offices in New York, New York.

115.    Defendant Piper Jaffray was an underwriter of the Company's SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete offering documents.  Piper Jaffray acted as a representative of all the underwriters.  Piper Jaffray also participated in conducting and promoting the roadshow for the SPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Piper Jaffray's participation in and its solicitation of offers in connection with the SPO was motivated by its financial interests.  Defendant Piper Jaffray conducts business and maintains offices in New York, New York.

116.    Defendant Needham & Company, LLC ("Needham") was an underwriter of the Company's SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete offering documents.  Needham participated in conducting and promoting the roadshow for the SPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Needham's participation in and

its solicitation of offers in connection with the SPO was motivated by its financial interests. Defendant Needham conducts business and maintains offices in New York, New York.

117.    Defendant BTIG, LLC ("BTIG") was an underwriter of the Company's SPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete offering documents.    BTIG participated in conducting and promoting the roadshow for the SPO and paying for the expenses of the Individual Securities Act Defendants who participated in the roadshow, including lodging and travel, among other expenses.    BTIG's participation in and its solicitation of offers in connection with the SPO was motivated by its financial interests.    Defendant BTIG conducts business and maintains offices in New York, New York.

118.    Defendants listed in ¶¶108-111 are collectively referred to herein as the "IPO Underwriter Defendants."    Defendants listed in ¶¶112-117 are collectively referred to herein as the "SPO Underwriter Defendants."    The IPO Underwriter Defendants and the SPO Underwriter Defendants are collectively referred to herein as the "Underwriter Defendants."

119.    Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the IPO Offering Documents and SPO Offering Documents (collectively, the "Offering Documents").    In addition, although not an element of Plaintiff's claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act.    Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

120.    Each Underwriter Defendant named herein is an investment banking firm whose activities include, inter alia, the underwriting of public offerings of securities.  As the underwriters of the IPO and the SPO, the Underwriter Defendants earned lucrative underwriting fees.

121.    As underwriters, the Underwriter Defendants met with potential investors in the IPO and SPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

122.    Representatives of the Underwriter Defendants also assisted NextCure and the Individual Securities Act Defendants in planning both the IPO and SPO.  They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

123.    In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to NextCure's management, directors, and lawyers to determine: (i) the strategy to best accomplish the IPO and SPO; (ii) the terms of the IPO and SPO, including the price at which NextCure's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about NextCure would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and NextCure's

management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of NextCure's undisclosed then-existing problems and plans and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

124.   The Underwriter Defendants also demanded and obtained an agreement from NextCure under which NextCure agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

125.   The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with NextCure's IPO and its SPO, so that they, and the Individual Securities Act Defendants, could offer to sell, and sell, NextCure shares to Plaintiff and the members of the Securities Act Class pursuant (or traceable) to the Offering Documents.

## IX.   NEXTCURE'S DEFECTIVE IPO

126.   On April 12, 2019, NextCure filed a registration statement with the SEC on Form S-1, which, after several amendments, was declared effective on May 8, 2019 (the Form S-1, together with all amendments, is referred to the "Registration Statement").

127.   On May 9, 2019, the Company filed a prospectus for its IPO on Form 424B4, which incorporated and formed part of the Registration Statement (the "Prospectus").

128.   The Registration Statement and Prospectus (collectively, the "IPO Offering Documents") were used to sell to the investing public 5.75 million shares of NextCure common stock at $15 per share.  Defendants generated approximately $86.25 million in gross offering proceeds (after the Underwriter Defendants fully exercised their options) from their sale of the Company's securities in the IPO.

129.   The IPO Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules

and regulations governing the preparation of those documents.  In particular, as detailed below, the Offering Documents made material misstatements and omissions about the novelty and uniqueness of NextCure's FIND-IO platform, and, relatedly, of Defendant Richman's affiliation with a direct competitor, Immunaccel.

130.    As mentioned above, Defendant Richman co-founded NextCure and has served as its President, CEO and member of its Board since October 2015. Prior to founding NextCure, as noted in the IPO Offering Documents, Defendant Richman served in senior management roles at numerous biopharmaceutical companies, many of which focused on immune-oncology:

> Mr. Richman served as President and Chief Executive Officer of Amplimmune, Inc. (now MedImmune, LLC), a biopharmaceutical company focused on immuno-oncology, from 2007 to August 2015, including through Amplimmune's acquisition by AstraZeneca plc in October 2013. Before Amplimmune, Mr. Richman served as Executive Vice President and Chief Operating Officer of MacroGenics, Inc., a biopharmaceutical company focused on the treatment of cancer, from 2002 to 2007. Mr. Richman joined MacroGenics with approximately 20 years' experience in corporate business development within the biotechnology industry. Mr. Richman has served as a director of Pieris Pharmaceuticals, Inc., a public company, since December 2014 and as a director of Madison Vaccines, Inc., a private company, since May 2014. Mr. Richman was previously a member of the board of directors of GenVec, Inc. from April 2015 until its acquisition by Intrexon Corporation in June 2017 and Opexa Therapeutics, Inc. from June 2006 until its acquisition by Acer Therapeutics in September 2017. Mr. Richman received a B.S. in genetics and molecular biology from the University of California at Davis and an M.S.B.A. in international business from San Francisco State University.

131.    Given his highly relevant background and experience, it is of no surprise that Defendant Richman is (and has always been) intimately involved in all aspects of the Company's business, including the disappointing NC318 trial, and inimitably important to helping NextCure attempt to achieve its key objectives.  As the IPO Offering Documents state in no uncertain terms, "***the loss of the service[] of Mr. Richman…could impede the achievements of our research, development and commercialization objectives***."

132.    Moreover, Defendant Richman signed a letter agreement with the Company in August 2016 that governed the terms of his employment.  Pursuant to that agreement, Defendant Richman received an annual base salary in excess of $375,000, an annual bonus of up to 35% of his base salary, equity compensation, health insurance benefits and other fringe benefits approved by the Board, on which he serves.  What is more, in the event NextCure terminated his employment, Defendant Richman was entitled to receive a series of payments and benefits for a considerable amount of time thereafter.  Defendant Richman's experiences, business acumen, and presence at the helm of the Company is, therefore, material to NextCure's future success, and, as a result, reasonably likely to be material to the Securities Act Class's investment in the Company at the time of the IPO.

133.    So, too, was (and is) the Company's purported "proprietary platform," FIND-IO, which the IPO Offering Documents repeatedly touted (and credited) for NextCure's past, present and future success, including why it was able to land a material, multi-year collaboration arrangement with Lilly, which served as the single-source of NextCure's revenues from 2018 to present.[5]

134.    For example, in the "Overview" section located under the header "Prospectus Summary," the IPO Offering Documents state: "Through our ***proprietary*** Functional, Integrated, NextCure Discovery in Immuno-Oncology, or FIND-IO, platform, we study various immune cells to discover and understand targets and structural components of immune cells and their functional

---

[5]     In November 2018, NextCure and Lilly agreed to work together to discover and develop immunomedicines for oncology using NextCure's FIND-IO platform.  The collaboration sought to discover novel cancer targets utilizing NextCure's platform and provided both NextCure and Lilly the right to receive options to exclusively develop antibodies resulting from the collaboration.  In connection with the collaboration agreement, NextCure received an upfront payment of $25 million in cash and an equity investment of $15 million.  NextCure was also eligible to receive development and regulatory milestones and sales milestones in the aggregate of up to $1.4 billion, as well as royalty payments.    As discussed *infra*, Lilly abruptly cancelled the collaboration agreement in January 2021, sending NextCure's stock tumbling.

impact in order to develop immunomedicines." The IPO Offering Documents go on to state that, "[t]he success of our business depends in part upon our ability to identify targets based on ***our proprietary FIND-IO platform*** and to develop and commercialize immunomedicines. ***Our approach to the discovery of targets using the FIND-IO platform is <u>novel</u>***[,]" before then explaining:

> Our approach to identifying targets for new immunomedicines is ***based on our FIND-IO platform***. FIND-IO embodies a rational approach to the discovery of novel cell surface and secretory molecules that drive functional immune responses. ***We use our immunology knowledge, experience, capabilities and tools we have developed, including our FIND-IO platform***, to support our discovery efforts.
>
> \*       \*       \*
>
> Since our founding in 2015, ***we have developed, industrialized and optimized our FIND-IO platform based on the immunological expertise of our management team*** and the scientific leadership of our scientific founder, Dr. Lieping Chen. Our approach in creating the FIND-IO platform, and how we apply it, reflects our belief in the importance of understanding biological pathways of all cells in the immune system and restoring normal immune function. ***The platform uses our proprietary approaches*** to assess the suppressive or stimulatory function of immune pathways in T cells and other immune cells…

135.    In addition, when describing NextCure's approach to developing immunomedicines for cancer in the "Business" section of the IPO Offering Documents, Defendants affirmatively state, "[o]ur approach to identifying targets for new immunomedicines in cancer is ***based on the combination of <u>our</u> FIND-IO platform, <u>our</u> immunological expertise and <u>our</u> belief in the importance of understanding biological pathways and the normal function of the immune system*** in the TME."

136.    The IPO Offering Documents also provide details about how NextCure's FIND-IO platform was created and the role intellectual property plays in providing NextCure both protections from and a strategic advantage over its competitors, stating in relevant part:

*To create our FIND-IO platform, we industrialized, expanded and optimized the T Cell Activity Array, or the TCAA, a predecessor of the FIND-IO platform that Dr. Chen used to discover the immunosuppressive properties of S15.* Our work in developing the FIND-IO platform beyond the TCAA includes using different and expanded gene libraries, adding biological pathways and reporters, expanding immune cell types and, most importantly, increasing the repertoire of functional assay readouts. We also broadened the platform to look at signaling within both the immune cell and the cell expressing the library gene.  By transferring cells with library genes, which encode membrane-bound or soluble proteins, FIND-IO is designed to determine whether the genes have signaling functions when interacting with an immune cell.

*Our FIND-IO technology includes proprietary approaches to functionally assess immune pathways* in both primary immune cells and established cell lines from immune lineages, including T cell subsets, monocytes, macrophage subpopulations, dendritic cells, cancer cell lines and cells isolated from diseased patients.

\*       \*       \*

Our commercial success depends in part on our ability to obtain and maintain proprietary protection for our products, methods and manufacturing processes, to operate without infringing the proprietary rights of others and to prevent others from infringing our proprietary rights. We rely on a combination of patent applications and trade secrets, as well as contractual protections, to establish and protect our intellectual property rights.

\*       \*       \*

*We also rely upon trade secrets, know-how and continuing technological innovation to develop and maintain our competitive position, including with respect to our FIND-IO platform*. We seek to protect our proprietary technology and processes, in part, by confidentiality and invention assignment agreements with our employees, consultants, scientific advisors and other contractors. In addition, in the ordinary course of our business, we enter into agreements with other third parties for non-exclusive rights to intellectual property directed to other technologies that are *ancillary* to our business, including laboratory information management software and research and development tools.

137.    With respect to competition, the IPO Offering Documents provide, in relevant part:

The biotechnology and pharmaceutical industries, and the immuno-oncology subsector, are characterized by rapid evolution of technologies, fierce competition and strong defense of intellectual property. *We believe that our programs, platforms, technology, knowledge, experience and scientific resources provide us*

47

*with competitive advantages,* but we also face competition from pharmaceutical and biotechnology companies, academic institutions, governmental agencies and public and private research institutions, among others. Our competitors include larger and better funded biopharmaceutical, biotechnology and therapeutics companies, including companies focused on cancer immunotherapies, such as Amgen, Inc., AstraZeneca plc, Bristol-Myers Squibb Company, or BMS, Genentech, Inc., GlaxoSmithKline PLC, Merck & Co., Inc., Novartis AG, Pfizer Inc., Roche Holding Ltd and Sanofi S.A. Moreover, we ***may*** also compete with smaller or earlier-stage companies, universities and other research institutions that have developed, are developing or may be developing current and future cancer therapeutics.

138. Finally, the IPO Offering Documents affirmatively state that NextCure "***tr[ies] to ensure that our employees, consultants and advisors do not use the proprietary information or know-how of others in their work for us.***"

139. Unbeknownst to investors, however, the statements identified in ¶¶134-138 were materially inaccurate, misleading, and/or incomplete because they failed to disclose that, as of the IPO, Defendant Richman was affiliated with a direct competitor, Immunaccel, whose proprietary know-how ***had been*** misappropriated by NextCure and whose technology, in fact, ***served*** as the foundation of NextCure's purportedly "proprietary" and "novel" FIND-IO targeting platform. Indeed, Defendant Richman was recruited to assist in building Immunaccel, which provided a "three-dimensional platform designed to study the tumor microenvironment in cancer research." In 2016, while serving on the Board of Managers of Immunaccel—*a position he held until 2019*—Defendant Richman arranged for NextCure to become a customer of Immunaccel because of their "mutual focus on immune-oncology and Immunaccel's 3D technology." The two companies entered into a Contract Services Agreement and Defendant Richman, in his capacity as NextCure's CEO, began receiving confidential information regarding Immunaccel's 3D assays and its 3D platform, which he then used to enable NextCure to develop its own platform, effectively copying Immunaccel's 3D technology, and market itself in direct competition. Thus, *at the time of*

*NextCure's IPO*, the Securities Act Defendants knew, contrary to repeated statements otherwise, that NextCure *was not* "ensur[ing] that [its] employees […] [were] not us[ing] the proprietary information or know-how of others" and that NextCure's FIND-IO platform was not "unique" or "novel," not "developed…based on the immunological expertise of [NextCure's] management team*,*" certainly not "proprietary," and more than likely to be (if not surely) in clear violation of agreements that Defendant Richman, himself, entered, which exposed the Company to significant legal and reputational risks.

140.    Although these facts existed at the time of the IPO, the Company failed to disclose them.  Instead, NextCure, the Individual Securities Act Defendants and the IPO Underwriter Defendants merely included generalized "Risk Factors" in the IPO Offering Documents.  For example, the IPO Offering Documents generally stated that "*many of [NextCure's] employees, consultants or advisors are currently, or were previously, employed at universities or other biotechnology or pharmaceutical companies, including [its] competitors or potential competitors*," and that the Company "*may*", in the future, be subject to "claims asserting that [NextCure's] employees, consultants or advisors have wrongfully used or disclosed alleged trade secrets of their current or former employers," noting that such risks "*may*" increase as its "product candidates approach commercialization and as [NextCure] gains greater visibility as a public company."

141.    Further, with regards to "risks" related to NextCure's "approach to the discovery and development of product candidates using [its] FIND-IO platform," the IPO Offering Documents summarily claimed:

> *If we uncover any previously unknown risks related to our FIND-IO platform*, or
> if we experience unanticipated problems or delays in developing our FIND-IO
> product candidates, *we **may** be unable to achieve our strategy* of building an

oncology pipeline of novel targets for new immunomedicines focused on non-responders, *or meet our obligations under the Lilly Agreement*.

142.    Similarly, with respect to "third parties [that] "***may***" initiate legal proceedings alleging that [NextCure is] infringing their intellectual property rights," the IPO Offering Documents state:

> Our commercial success depends upon our ability and the ability of any collaborators to develop, manufacture, market and sell our product candidates and use our proprietary technologies without infringing the proprietary rights and intellectual property of third parties. ***We cannot provide any assurances that third-party patents do not exist which might be enforced against our current manufacturing methods, product candidates or future methods or products, resulting in either an injunction prohibiting our manufacture or sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties***.

> The biotechnology and pharmaceutical industries are characterized by extensive and complex litigation regarding patents and other intellectual property rights. ***We may in the future become party to, or be threatened with, adversarial proceedings or litigation regarding intellectual property rights with respect to our product candidates and technology***, including post grant review and *inter partes* review before the USPTO. The risks of being involved in such litigation and proceedings may also increase as our product candidates approach commercialization and as we gain greater visibility as a public company. Third parties may assert infringement claims against us based on existing patents or patents that may be granted in the future, regardless of their merit. There is a risk that third parties may choose to engage in litigation with us to enforce or to otherwise assert their patent rights against us. Even if we believe such claims are without merit, a court of competent jurisdiction could hold that these third-party patents are valid, enforceable and infringed, which could materially and adversely affect our ability to commercialize any of our product candidates or technologies covered by the asserted third-party patents.

> ...A finding of infringement could prevent us from manufacturing and commercializing our product candidates or force us to cease some of our business operations, which could materially harm our business. ***Claims that we have misappropriated the confidential information or trade secrets of third parties <u>could</u> have a similar negative impact on our business, financial condition, results of operations and prospects***.

143.    The IPO Offering Documents added:

***While we are presently unaware of any claims or assertions by third parties with respect to our patents or other intellectual property***, we cannot guarantee that a third party will not assert a claim or an interest in any of such patents or intellectual property. For example, a third party ***may*** claim an ownership interest in one or more of our, or our licensors', patents or other proprietary or intellectual property rights. A third party ***could*** bring legal actions against us to seek monetary damages or enjoin clinical testing, manufacturing or marketing of the affected product candidate or product. … Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations or prospects.

144.     And, with respect to competition, the IPO Offering Documents state:

The biotechnology industry is intensely competitive and subject to rapid and significant technological change. Our current or future product candidates ***may*** face competition from major pharmaceutical companies, specialty pharmaceutical companies, universities and other research institutions and from products and therapies that currently exist or are being developed, some of which products and therapies we may not currently know about. Many of our competitors have significantly greater financial, manufacturing, marketing, product development, technical and human resources than we do.

*        *        *

…***Our competitors may also develop drugs or discovery platforms that are more effective, more convenient, more widely used or less costly than our product candidates or our FIND-IO platform*** or, in the case of drugs, have a better safety profile than our product candidates. These competitors may also be more successful than us in manufacturing and marketing their products, and have significantly greater financial resources and expertise in research and development.

***There are a large number of companies developing or marketing treatments for cancer, including many major pharmaceutical and biotechnology companies.*** Currently marketed oncology drugs and therapeutics range from traditional cancer therapies, including chemotherapy, to antibody-drug conjugates, such as Genentech's Kadcyla, to immune checkpoint inhibitors targeting CTLA-4, such as BMS' Yervoy, and PD-1/PD-L1, such as BMS' Opdivo, Merck & Co.'s Keytruda and Genentech's Tecentriq, to T cell-engager immunotherapies, such as Amgen's Blincyto.

*        *        *

***Smaller and other early stage companies may also prove to be significant competitors. These third parties compete with us in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our current and future product candidates.***

In addition, the biopharmaceutical industry is characterized by rapid technological change. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our product candidates obsolete, less competitive or not economical.

145.    These supposed "Risk Factors" were materially inaccurate, misleading, and/or incomplete because they suggested that there was only a contingent possibility of a problem when, in fact, the risks concerning NextCure's misappropriation of Immunaccel's confidential information and, in particular, Defendant Richman's affiliation with Immunaccel, ***had already come to pass.***  By the time of the IPO, Defendant Richman was serving on the Board of Managers of Immunaccel, had received confidential information about Immunaccel's 3D assays and 3D platform, and had leveraged that information to essentially create a direct competitor to Immunaccel's technology, NextCure's FIND-IO platform.  Accordingly, *by the time of the IPO*, it was known (albeit concealed) that FIND-IO was, in fact, not "novel," "unique" or "proprietary," in direct competition with Immunaccel's technologies, and that the Company's IPO and continued efforts towards commercializing its leading treatments, was reasonably likely to result in claims that NextCure had misappropriated Immunaccel's confidential information or trade secrets.  As a result, the "risks" described in these "Risk Factors" had already materialized (or were certain to materialize) and were adversely affecting the Company's business, operations and financial results, not merely hypothetical future possibilities.

146.    Yet, with these material deficiencies, the Company successfully sold 5.75 million shares of NextCure common stock at the IPO Offering price of $15 per share, generating gross proceeds of $86.25 million (before deducting underwriting discounts and commissions and estimated offering expenses).

## X.    NEXTCURE'S DEFECTIVE SECONDARY OFFERING

147.    On November 12, 2019, looking to capitalize on its artificially inflated stock price, NextCure filed a draft Registration Statement on Form S-1 with the SEC, which would later be utilized for the SPO following amendment.   On November 14, 2019, the SEC declared the Registration Statement effective.

148.    On or about November 14, 2019, NextCure, the Securities Act Individual Defendants, and the Underwriter Defendants priced the SPO, and on November 18, 2019, NextCure filed the final Prospectus for the SPO, which forms part of the Registration Statement (collectively referred to herein as the "SPO Offering Documents").

149.    Through its SPO, NextCure offered 4,077,192 shares (or up to 4,688,770 shares if the Underwriter Defendants exercised their option to purchase additional shares in full) at an offering price of $36.75 per share for anticipated gross proceeds between $149.8 and $173 million. The SPO closed on November 19, 2019.   The Company raised $172.2 million in gross proceeds.

150.    As before, the SPO Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of those documents.   In addition to being false and misleading because the SPO Offering Documents failed to address Defendant Richman's affiliation with Immunaccel and the existence of Immunaccel's 3D assays and 3D technology, which directly competed with and formed the foundation of NextCure's FIND-IO platform (*see supra*), the SPO Offering Documents made additional material misstatements and omissions about NC318 efficacy and potential.

151.    For example, the SPO Offering Documents stated, "***NC318 has the potential to treat multiple cancer indications***," and characterized NC318 as being "***well suited to treat patients***

*who are not responding to PD-1/PD-L1 directed cancer therapies*."   The SPO Offering

Documents also touted the supposed efficacy data observed from NextCure's Phase 1 trial, despite

its objective being simply to determine the pharmacologically active dose and/or the maximum

tolerable dose of NC318, stating in relevant part:

> The Phase 1 portion was designed to determine the pharmacologically active dose, defined as the dose that provides a maximal biologic effect, such as an increase in biomarkers of immune activation or a reduction of biomarkers associated with immune suppression, and/or the maximum tolerable dose of NC318, including defining the optimal dose administration schedule and the maximum number of tolerated doses.

*   *   *

> **Data from the trial indicate activity in multiple tumor types,** including durable stable disease in patients with NSCLC, endometrial cell cancer, ovarian cancer, squamous cell carcinoma, Merkel cell cancer, and head and neck cancer. As of November 9, 2019, **durable responses observed include one complete response, which remains ongoing at 55 weeks, and one partial response, which remains ongoing at 28 weeks, both in NSCLC patients**, as well as 14 patients with stable disease, which remain ongoing for between 16 and 42 weeks.

152.   Again, the statements made by Defendants in ¶151 above, concerning the

effectiveness of NC318, the responses observed in patients treated with NC318, and NC318's

potential to treat patients' refractory to PD-1 therapies, were materially misleading when made in

that they created a positive impression of NC318 unsupported by the data.   While Defendants are

free to tout positive information about NC318, under the federal securities laws, they are bound to

do so in a manner that will not mislead investors.   This responsibility includes disclosing any

additional adverse information that cuts against the voluntarily revealed, positive information

presented.   Here, Defendants' statements were materially misleading because the NC318 data

Defendants possessed, *at the time of the SPO*, showed, at minimum, that NC318's efficacy in

patients with NSCLC was difficult to assess or even unlikely (*i.e.*, only seeing objective responses

in 2 out of 10 (rather than 2 out of 7) NSCLC patients) and, with respect to patients across the

54

cancer continuum, limited (if even useful at all), with only 10 out of 49 non-NSCLC patients showing "stable disease."  These lackluster objective responses in the majority of cohorts tested suggested a significant realizable risk that NC318 would not have much potential, much less be as popular as then-existing FDA-approved blockbuster drugs like Keytruda and Opdivo.

153.   Although these facts existed at the time of the SPO, NextCure, the Individual Securities Act Defendants and the SPO Underwriter Defendants failed to disclose them.  Instead, as with NextCure's IPO, generalized "Risk Factors" were included in the SPO Offering Documents that purported to "warn" of contingent risks related to NC318 and NextCure's Phase 1 clinical trial.  For example, regarding "risks" related to "early-stage clinical trials," the SPO Offering Documents stated, "[p]reclinical studies and early-stage clinical trials are primarily designed to test safety, to study pharmacokinetics and pharmacodynamics and to understand the side effects of product candidates at various doses and schedules, and *the results of any early-stage clinical trials may not be predictive of the results of later-stage, large-scale efficacy clinical trials*.  In addition, *initial success in clinical trials may not be indicative of results obtained when such trials are completed*."

154.   The Company also drew attention to "interim and preliminary results" and the possibility that both "*may* change as more patient data becomes available."  Under the headline, "Interim and Preliminary results from our clinical trials that we announce or publish from time to time may change as more patient data because available and are subject to audit, validation and verification procedures that could result in material changes in the final data," the SPO Offering Documents stated in relevant part:

> From time to time, we may publish interim data, including interim top-line results or preliminary results from our clinical trials. *Interim data and results from our clinical trials are subject to the risk that one or more of the clinical outcomes <u>may</u> materially change as patient enrollment continues and more patient data become*

*available*. Preliminary or top-line results also remain subject to audit, validation and verification procedures that may result in the final data being materially different from the interim and preliminary data we previously published. As a result, in*terim and preliminary data **may not** be predictive of final results* and should be viewed with caution until the final data are available. Differences between preliminary or interim data and final data could significantly harm our business prospects and may cause the trading price of our common stock to fluctuate significantly.

155.    Similarly, under the headline "***Because the number of subjects in our Phase 1/2 clinical trial of NC318 is small, the results from this trial, once completed, may be less reliable than results achieved in larger clinical trials***," the SPO Offering Documents stated:

> A study design that is considered appropriate includes a sufficiently large sample size with appropriate statistical power, as well as proper control of bias, to allow a meaningful interpretation of the results. ***The preliminary results of studies with smaller sample sizes, such as our ongoing Phase 1/2 clinical trial of NC318, can be disproportionately influenced by the impact the treatment had on a few individuals, which limits the ability to generalize the results across a broader community, thus making the study results less reliable than studies with a larger number of subjects***. As a result, there ***may*** be less certainty that NC318 would achieve a statistically significant effect in any future clinical trials. If we conduct any future clinical trials of NC318, we ***may*** not achieve a statistically significant result or the same level of statistical significance seen, if any, in our Phase 1/2 clinical trial.

156.    These supposed "Risk Factors" were materially inaccurate, misleading, and/or incomplete because they suggested that there was only a contingent possibility of a problem when, in fact, the risks concerning NC318 ***had already come to pass.***  By the time of the SPO, Defendants observed and had ample opportunity to carefully evaluate NextCure's Phase 1 trial showing the NC318 lacked efficacy and achieved lackluster objective responses across cohorts, indicating that NC318 was not, in fact, effective in treating most tumor types, that the NC318 application was proving to be limited (if even useful at all), and that there was a significant realizable risk that NC318 would not be nearly as popular as then-existing blockbuster drugs, such as Keytruda and Opdivo.  As a result, the "risks" described in these "Risk Factors" around the possibility that early

results "may be less reliable" or "may materially change," had already materialized (or were certain to materialize in the case of the Company's stock price) and were adversely affecting the Company's business, operations and financial results, not merely hypothetical future possibilities.

157.    With these material deficiencies, the Company successfully sold 4,077,192 shares of its common stock at the SPO Offering Price of $36.75 per share.  In total, the SPO generated approximately $172.2 million in total proceeds to the Company.

## XI.    MATERIAL OMISSIONS IN THE COMPANY'S OFFERING DOCUMENTS IN VIOLATION OF APPLICABLE REGULATIONS

158.    In addition, Item 303 imposed an independent duty on Defendants to disclose in the Offering Documents any known events, trends, or uncertainties that NextCure, as of the Offerings, "reasonably expect[ed] will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company…with particular emphasis on the registrant's prospects for the future."  *Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation*, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 29, 2003).

159.    The IPO Offering Documents violated Item 303 by failing to disclose that, as of the IPO, NextCure had effectively copied direct competitor and Defendant Richman-affiliate, Immunaccel's 3D technology and 3D assay, to create, enhance or otherwise support its FIND-IO

platform, undercutting Defendants' claims that FIND-IO was "novel," "unique," and "proprietary," exposing the Company to potential legal and reputational risks from claims by Immunaccel, and calling into question the supposed "value" of FIND-IO.

160.    The SPO Offering Documents violated Item 303 for the same reasons and because it failed to disclose that, as of the SPO, the NC318 data Defendants possessed showed a lack of efficacy and objective response.  Specifically, that NC318 was *not* effective in treating most tumor types, that the NC318 application was ***proving to be limited*** (if even useful at all), and that there was a significant realizable risk that NC318 would *not* be nearly as popular as then-existing blockbuster drugs, such as Keytruda and Opdivo.

161.    Likewise, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), imposed an independent duty on Defendants to provide, among other things, a "discussion of the most significant factors that make the offering speculative or risky."  Here, one of the most significant factors that made the Offerings speculative or risky to investors was the fact that, at the time of the IPO, Defendants knew (or had reason to know) that FIND-IO was not as novel as they made it seem, and that, at the time of the SPO, Defendants had concerning NC318 data.

162.    Nowhere in the Offering Documents did NextCure disclose to investors that, as of the date of the Offerings, these material known trends were occurring.  Accordingly, disclosure of these material facts were required under Item 503.

## XII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### <u>COUNT III</u>

**For Violations of §11 of the Securities Act**
**(Against Defendant NextCure, the Individual Securities Act Defendants, and the Underwriter Defendants)**

163.    Plaintiff incorporates ¶1-162 by reference.

164.    This count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Class, against the Securities Act Defendants.  This is a non-fraud cause of action.  Plaintiff does not assert that the Securities Act Defendants committed intentional or reckless misconduct or that the Securities Act Defendants acted with scienter or fraudulent intent.

165.    The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

166.    The Company is the registrant of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material misrepresentations and omissions of material facts necessary to make the statements therein not false and misleading, NextCure is liable under §11 of the Securities Act to Plaintiff and the Class.

167.    The Individual Securities Act Defendants each signed the Offering Documents and caused them to be issued.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Securities Act Defendants should have known of the material misstatements and omissions contained in the

Offering Documents and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, the Individual Securities Act Defendants are liable to Plaintiff and the Class.

168.   The Underwriter Defendants each served as underwriters in connection with either the IPO, SPO, or both offerings.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents.  They had a duty to ensure that such statements were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

169.   The Securities Act Defendants acted negligently in preparing the Offering Documents.  None of the Defendants named in this Count made a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omission of any material facts and were not misleading.  In alleging the foregoing, Plaintiff specifically disclaims any allegation of fraud.

170.   By reasons of the conduct herein alleged, each Defendant named in this Count violated §11 of the Securities Act.

171.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement.   Rather, each such statement concerned existing facts.   Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

172.    Plaintiff acquired the Company's securities pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.   At all relevant times, the market for NextCure's stock consisted of shares made available through either NextCure's IPO or its SPO.   Plaintiff sustained damages, and the price of the Company's shares declined substantially due to material misstatements in the Offering Documents.

173.    This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of each offering.

174.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally

## COUNT IV

### For Violations of §15 of the Securities Act
### (Against the Individual Securities Act Defendants)

175.    Plaintiff incorporates ¶¶1-174 by reference.

176.    This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Individual Securities Act Defendants.

177.    The Individual Securities Act Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.   By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these

Defendants invested in, individually and collectively, and had the power to influence, and exercised same over, the Company to cause it to engage in the conduct complained of herein. Similarly, each of the other Individual Securities Act Defendants not only controlled those subject to liability as primary violators of §11 of the Securities Act, as alleged above, they directly participated in controlling NextCure by having signed, or authorized the signing of, the Registration Statements used in the IPO and the SPO, authorizing the issuance of NextCure securities to Plaintiff and members of the Class.

178.    As control persons of NextCure, each of the Individual Securities Act Defendants are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as NextCure for its violations of §11 of the Securities Act.

## CLASS ACTION ALLEGATIONS

179.    Plaintiff brings this action (including the claims asserted under both Parts One and Two of this Complaint) as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of NextCure common stock during the Class Period. Excluded from the Class are Defendants and their immediate families, the directors and officers of NextCure and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

180.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NextCure common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by NextCure or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the Country.  Joinder will be highly impracticable.

181.   Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

182.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

183.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    whether the price of NextCure common stock during the Class Period was artificially inflated because of Defendants' conduct as complained of herein;

    (c)    whether the IPO Offering Documents, including the contents of the documents incorporated therein by reference, were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

    (d)    whether the SPO Offering Documents, including the contents of the documents incorporated by reference, were materially false, incomplete, or

misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(e)     whether (with respect to the Exchange Act Claims) the other statements alleged herein to be actionable were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(f)     whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements (with respect to the Exchange Act claims); and

(g)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

184.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as Class Representative under Fed. R. Civ. P. 23 and plaintiff's counsel as Lead Counsel;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: February 26, 2021   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

        _/s/ Thomas L. Laughlin, IV_
       Thomas L. Laughlin, IV
       Jonathan M. Zimmerman (*pro hac vice forthcoming*)
       The Helmsley Building
       230 Park Avenue, 17th Floor
       New York, NY 10169
       Telephone: (212) 223-6444
       Facsimile: (212) 223-6334
       tlaughlin@scott-scott.com
       jzimmerman@scott-scott.com

       *Attorneys for Lead Plaintiff Ye Zhou*