# Exhibit E

424B4 1 a2238771z424b4.htm 424B4

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO FINANCIAL STATEMENTS

Table of Contents

**Filed pursuant to Rule 424(b)(4)**
**Registration No. 333-230837**

*5,000,000 Shares*



*NextCure, Inc.*

*Common Stock*

---

*NextCure, Inc. is offering 5,000,000 shares of common stock. This is our initial public offering and no public market exists for our common stock. The initial public offering price is $15.00 per share.*

---

*Our common stock has been approved for listing on the Nasdaq Global Select Market under the symbol "NXTC".*

---

**We are an "emerging growth company" as defined under U.S. federal securities laws and will be subject to reduced public company reporting requirements. Investing in our common stock involves risks. See "Risk Factors" beginning on page 12.**

|  | *Per Share* | *Total* |
| --- | --- | --- |
| *Initial Public Offering Price* | *$15.00* | *$75,000,000* |
| *Underwriting Discounts and Commissions*[1] | *$1.05* | *$5,250,000* |
| *Proceeds, before expenses, to us* | *$13.95* | *$69,750,000* |

(1)     *We refer you to "Underwriters" for additional information regarding total underwriter compensation.*

---

*We have granted the underwriters an option for a period of 30 days to purchase up to an additional 750,000 shares of our common stock.*

*Certain of our stockholders, including stockholders affiliated with certain of our directors, have agreed to purchase an aggregate of approximately $32.0 million of shares of our common stock in this offering at the initial public offering price and on the same terms as the other purchasers in this offering. The underwriters will receive the same underwriting discount on shares purchased by these stockholders as they will on any other shares sold to the public in this offering.*

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.*

*The underwriters expect to deliver the shares to purchasers on or about May 13, 2019.*

―――――――――――

*Joint Booking-Running Managers*

*MORGAN STANLEY*          *BofA MERRILL LYNCH*          *PIPER JAFFRAY*

*The date of this prospectus is May 8, 2019*

Table of Contents

**TABLE OF CONTENTS**

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 12 |
| Special Note Regarding Forward-Looking Statements | 63 |
| Use of Proceeds | 65 |
| Dividend Policy | 66 |
| Capitalization | 67 |
| Dilution | 69 |
| Selected Financial Data | 71 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 72 |
| Business | 83 |
| Management | 122 |
| Executive Compensation | 133 |
| Certain Relationships and Related Party Transactions | 145 |
| Principal Stockholders | 150 |
| Description of Capital Stock | 154 |
| Shares Eligible for Future Sale | 159 |
| Material U.S. Federal Income Tax Consequences to Non-U.S. Holders of Common Stock | 162 |
| Underwriters | 166 |
| Legal Matters | 172 |
| Experts | 172 |
| Where You Can Find More Information | 172 |
| Index to Financial Statements | F-1 |

Neither we nor any of the underwriters has authorized anyone to provide you any information that is different than that contained in this prospectus or any free writing prospectus prepared by or on behalf of us or to which we may have referred you in connection with this offering. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We and the underwriters are not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. The information in this prospectus is accurate only as of its date, regardless of the time of delivery of this prospectus or of any sale of shares of our common stock.

No action is being taken in any jurisdiction outside the United States to permit a public offering of our common stock or possession or distribution of this prospectus in that jurisdiction. Persons who come into possession of this prospectus in jurisdictions outside the United States must inform themselves about, and observe any restrictions as to, this offering and the distribution of this prospectus applicable to that jurisdiction.

i

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights information contained elsewhere in this prospectus and does not contain all of the information that you should consider in making your investment decision. Before investing in our common stock, you should read this entire prospectus carefully, including the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes contained elsewhere in this prospectus. Unless the context otherwise requires, references in this prospectus to the "company," "NextCure," "we," "us" and "our" refer to NextCure, Inc.*

### Overview

We are a clinical-stage biopharmaceutical company committed to discovering and developing novel, first-in-class immunomedicines to treat cancer and other immune-related diseases by restoring normal immune function. We view the immune system holistically and, rather than target one specific immune cell type, we focus on understanding biological pathways, the interactions of cells and the role each interaction plays in an immune response. Through our proprietary Functional, Integrated, NextCure Discovery in Immuno-Oncology, or FIND-IO, platform, we study various immune cells to discover and understand targets and structural components of immune cells and their functional impact in order to develop immunomedicines. We are focused on patients who do not respond to current therapies, patients whose cancer progresses despite treatment and patients with cancer types not adequately addressed by available therapies. We are committed to discovering and developing first-in-class immunomedicines, which are immunomedicines that use new or unique mechanisms of action to treat a medical condition, for these patients.

Our lead product candidate, NC318, is a first-in-class immunomedicine against a novel immunomodulatory receptor called Siglec-15, or S15. In October 2018, we initiated a Phase 1/2 clinical trial of NC318 in patients with advanced or metastatic solid tumors. We expect completion of the Phase 1 portion of this trial in the fourth quarter of 2019 and completion of the Phase 2 portion in the fourth quarter of 2020. Our second product candidate, NC410, is a novel immunomedicine designed to block immune suppression mediated by an immune modulator called Leukocyte-Associated Immunoglobulin-like Receptor 1, or LAIR-1. We expect to submit an investigational new drug application, or IND, to the U.S. Food and Drug Administration, or FDA, for NC410 in the first quarter of 2020.

Our approach to identifying targets for new immunomedicines is based on our FIND-IO platform. FIND-IO embodies a rational approach to the discovery of novel cell surface and secretory molecules that drive functional immune responses. We use our immunology knowledge, experience, capabilities and tools we have developed, including our FIND-IO platform, to support our discovery efforts. We are working to discover novel targets that play a key role in mediating immune dysfunction that allows tumors to evade the immune system. We are seeking to identify and develop immunomedicines that counteract these outcomes and to further validate and advance our product candidates. We have identified multiple novel targets using our FIND-IO platform, including those for which certain of our research programs are being designed to target. In addition, the immunosuppressive properties of S15, the target of NC318, were discovered using a predecessor of our FIND-IO platform.

The advancement of cancer to late stages indicates a failure of the immune system to mount an effective anti-tumor immune response. Immuno-oncology, which focuses on stimulating the immune system to respond to cancer and includes checkpoint inhibitors targeting PD-L1, PD-1 and CTLA-4, is one of the most significant advances in the history of cancer treatment. In 2011, the first checkpoint inhibitor was approved, and today, despite only a modest breadth of efficacy, this class of therapies is estimated to have had global sales of more than $17 billion in 2018 and is predicted to reach more than $33 billion in global sales by 2022. However, despite the recent success of checkpoint inhibitors, efficacy has been limited. It is estimated that up to 60% to 70% of cancer patients, including those with melanoma, renal cell cancer, colorectal cancer, non-small cell lung cancer, urothelial cancer and head and neck squamous cell carcinoma, do not respond to single-agent therapy with checkpoint inhibitors. In addition, some patients

Table of Contents

develop resistance after initial treatment with these therapies. As a result, the standard of care in cancer today leaves many patients underserved. We believe broader efficacy and more meaningful clinical responses in oncology may be obtained by focusing on the tumor microenvironment, or TME.

We are using our FIND-IO platform as our discovery engine to identify targets and develop immunomedicines that restore normal immune function in the TME through novel mechanisms of action. Since our founding in 2015, we have developed, industrialized and optimized our FIND-IO platform based on the immunological expertise of our management team and the scientific leadership of our scientific founder, Dr. Lieping Chen. Our approach in creating the FIND-IO platform, and how we apply it, reflects our belief in the importance of understanding biological pathways of all cells in the immune system and restoring normal immune function. The platform uses our proprietary approaches to assess the suppressive or stimulatory function of immune pathways in T cells and other immune cells, as measured by effects on proliferation or induction of molecules known to impact immune responses, such as cytokines, which are signaling molecules secreted by cells in the immune system that mediate and regulate immunity and inflammation. We study primary immune cells from healthy donors and from patients with various diseases, as well as established cell lines from immune and non-immune cell lineages, including T cell subsets, monocytes, macrophage subpopulations and cancer cell lines. In oncology, we are using the FIND-IO platform to discover immunomedicines with the potential to intervene or modulate interactions of immune cells within the TME to restore anti-tumor activity. We are also expanding the functional screening approach of our FIND-IO platform for the identification of novel targets in other serious illnesses outside of oncology, including autoimmune, inflammatory and neuro-inflammatory diseases.

In November 2018, we entered into a multi-year collaboration agreement with Eli Lilly and Company, or Lilly, focused on the discovery and development of immunomedicines for oncology using our FIND-IO platform. The collaboration seeks to discover novel cancer targets utilizing our platform and provides that we and Lilly will each receive options to exclusively develop antibodies resulting from the collaboration. In connection with the agreement, we received an upfront payment of $25.0 million in cash and an equity investment of $15.0 million and are eligible to receive development and regulatory milestones and sales milestones in an aggregate of up to $1.4 billion, as well as royalty payments.

2

Table of Contents

**Our Pipeline**

We are leveraging our understanding of biological pathways and our FIND-IO platform to discover, validate and build a proprietary pipeline of immunomedicine candidates. The figure below details our pipeline of product candidates and principal discovery and research programs.

| PROGRAMS | CELLS | DISCOVERY | PRECLINICAL | PHASE 1 | PHASE 2 | PHASE 3 | NEXT MILESTONE | WORLDWIDE RIGHTS |
|---|---|---|---|---|---|---|---|---|
| **PRODUCT CANDIDATES** | | | | | | | | |
| NC318 (S15) | Tumors and macrophages | ONCOLOGY | | | | | Phase 1 complete in Q4 2019 | NextCure |
| NC410 (LAIR-1) | Dendritic and T cells | ONCOLOGY | | | | | IND filing in Q1 2020 | NextCure |
| **DISCOVERY AND RESEARCH PROGRAMS** | | | | | | | | |
| Multiple Programs | Immune cells | | | | | | First IND filing in early 2021 | NextCure |
| FIND-IO Platform | Multiple cell types | | | | | | First IND filing in late 2022 | NextCure Lilly |

**Our Programs**

NC318, our lead immunomedicine program, is a monoclonal antibody targeting S15, which is expressed on highly immunosuppressive cells called M2 macrophages and on tumor cells. The immunosuppressive properties of S15 were discovered in 2015 at Yale University by Dr. Chen. Dr. Chen was also the first to discover a molecule he called B7-H1, which is now more widely known as PD-L1, or programmed cell death protein ligand 1, which is the ligand for PD-1, or programmed cell death 1. In preclinical research, we and others observed that S15 promotes suppression of T cell proliferation and negatively regulates T cell function. NC318 is designed to block this S15-mediated immune suppression and restore T cell function and anti-tumor immunity in the TME, which we believe will reduce and kill tumors. We believe NC318 has the potential to treat multiple cancer indications because S15 is expressed in multiple tumor types and has a unique ability to modulate immune responses in the TME. In addition, because S15 and PD-L1 expression in tumors generally appear to be non-overlapping, we believe NC318 may be well suited to treat patients who are not responding to PD-1/PD-L1 directed cancer therapies.

In preclinical studies, we evaluated the safety and efficacy of 5G12, the murine parent antibody of NC318, which has similar overall functional properties to NC318, and observed that blocking the effects of S15 with 5G12 restored immune function and anti-tumor immunity, reduced tumor growth and increased survival. Our ongoing first-in-human trial is an open-label, Phase 1/2 clinical trial designed to assess the safety and tolerability of NC318, to define the maximal tolerable dose or pharmacologically active dose and to assess preliminary efficacy. Patients receive NC318 on day one of each cycle. We have initiated the trial with 14-day cycles; however, we may explore alternate dose administration schedules depending on pharmacokinetics, pharmacodynamics, biomarker data, safety results and feedback from investigators. We designed this clinical trial with a robust biomarker strategy to help evaluate clinical activity throughout the trial by focusing on markers of pharmacodynamics. We are initially evaluating NC318 for the treatment of

Table of Contents

offering, together with our existing cash and cash equivalents, will enable us to fund our operating expenses and capital expenditure requirements into the second half of 2022. This estimate is based on assumptions that may prove to be wrong, and we could use our available capital resources sooner than we expect. Changes may occur beyond our control that would cause us to consume our available capital before that time, including changes in and progress of our development activities, acquisitions of additional product candidates and changes in regulation.

If we raise additional capital through marketing, sales and distribution arrangements or other collaborations, strategic alliances or licensing arrangements with third parties, we may have to relinquish certain valuable rights to our product candidates, future revenue streams or research programs, technologies or grant licenses on terms that may not be favorable to us. If we raise additional capital through public or private equity offerings, the terms of these securities may include liquidation or other preferences that adversely affect our stockholders' rights. Further, to the extent that we raise additional capital through the sale of common stock or securities convertible or exchangeable into common stock, your ownership interest will be diluted. If we raise additional capital through debt financing, we would be subject to fixed payment obligations and may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends.

Adequate additional financing may not be available to us on acceptable terms, or at all. If we are unable to obtain additional financing on favorable terms when needed, we may be required to delay, limit, reduce or terminate preclinical studies, clinical trials, or other research and development activities or one or more of our development programs.

**Risks Related to the Discovery and Development of Our Product Candidates**

***Our business is dependent on our ability to advance our current and future product candidates through clinical trials, obtain marketing approval and ultimately commercialize them.***

We are early in our development efforts. We have only recently initiated our first clinical trial for NC318, our lead product candidate, and our second product candidate, NC410, is in preclinical development. Our ability to generate product revenues, which we do not expect will occur for several years, if ever, will depend heavily on the successful development and eventual commercialization of NC318, NC410 and any future product candidates we develop, which may never occur. Our current product candidates, including NC318 and NC410, and any future product candidates we develop will require additional preclinical or clinical development, management of clinical, preclinical and manufacturing activities, marketing approval in the United States and other jurisdictions, demonstration of effectiveness to pricing and reimbursement authorities, sufficient cGMP manufacturing supply for both preclinical and clinical development and commercial production, building of a commercial organization and substantial investment and significant marketing efforts before we generate any revenues from product sales.

The clinical and commercial success of our current and future product candidates will depend on several factors, including the following:

- timely and successful completion of preclinical studies and our clinical trials;

- sufficiency of our financial and other resources to complete the necessary preclinical studies and clinical trials;

- acceptance of the INDs for NC410 and future product candidates;

- successful enrollment in and completion of clinical trials;

- successful data from our clinical program that supports an acceptable risk-benefit profile of our product candidates in the intended patient populations;

15

Table of Contents

- our ability to consistently manufacture our product candidates on a timely basis or to establish agreements with third-party manufacturers, if needed;

- whether we are required by the FDA or comparable foreign regulatory authorities to conduct additional clinical trials or other studies beyond those planned or anticipated to support approval of our product candidates;

- acceptance of our proposed indications and the primary endpoint assessments evaluated in the clinical trials of our product candidates by the FDA and comparable foreign regulatory authorities;

- receipt and maintenance of timely marketing approvals from applicable regulatory authorities;

- successfully launching commercial sales of our product candidates, if approved;

- the prevalence, duration and severity of potential side effects or other safety issues experienced with our product candidates, if approved;

- entry into collaborations to further the development of our product candidates;

- obtaining and maintaining patent and trade secret protection or regulatory exclusivity for our product candidates;

- acceptance of the benefits and uses of our product candidates, if approved, by patients, the medical community and third-party payors;

- maintaining a continued acceptable safety, tolerability and efficacy profile of the product candidates following approval;

- competing effectively with other therapies;

- obtaining and maintaining healthcare coverage and adequate reimbursement from third-party payors;

- our ability to identify targets and immunomedicines, whether through our FIND-IO platform, through our relationships with Yale or otherwise; and

- enforcing and defending intellectual property rights and claims.

These factors, many of which are beyond our control, could cause us to experience significant delays or an inability to obtain regulatory approvals or commercialize our current or future product candidates, and could otherwise materially harm our business. Successful completion of clinical trials does not mean that NC318, NC410 or any future product candidates we develop will receive regulatory approval. Even if regulatory approvals are obtained, we could experience significant delays or an inability to successfully commercialize our current and any future product candidates we develop, which would materially harm our business. If we are not able to generate sufficient revenue through the sale of any current or future product candidate, we may not be able to continue our business operations or achieve profitability.

***The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be materially harmed.***

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. We have not obtained regulatory approval for any product candidate. Neither we nor any future collaborator is permitted to market any product candidates in the United States until we receive regulatory approval of a

16

Table of Contents

biologics license application, or BLA, from the FDA. It is possible that none of our current or future product candidates will ever obtain regulatory approval in the United States or elsewhere.

Our current and future product candidates could fail to receive regulatory approval for many reasons, including the following:

- the FDA or comparable foreign regulatory authorities may disagree with the design or implementation of our clinical trials;

- we may be unable to demonstrate to the satisfaction of the FDA or comparable foreign regulatory authorities that a product candidate is safe, pure and potent for its proposed indication;

- the results of clinical trials may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval;

- we may be unable to demonstrate that a product candidate's clinical and other benefits outweigh its safety risks;

- the FDA or comparable foreign regulatory authorities may disagree with our interpretation of data from clinical trials or preclinical studies;

- the data collected from clinical trials of our product candidates may not be sufficient to support the submission of a BLA to the FDA or regulatory submissions to comparable regulatory authorities to obtain regulatory approval in such jurisdiction;

- the FDA or comparable foreign regulatory authorities may find deficiencies with or fail to approve our manufacturing processes or facility or the manufacturing processes or facilities of third-party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may significantly change in a manner rendering our clinical data insufficient for approval.

This lengthy approval process as well as the unpredictability of clinical trial results may result in our failing to obtain regulatory approval to market any product candidate we develop, which would significantly harm our business, results of operations and prospects. The FDA and other comparable foreign authorities have substantial discretion in the approval process and in determining when or whether regulatory approval will be granted for any product candidate that we develop. Even if we believe the data collected from future clinical trials of our product candidates are promising, such data may not be sufficient to support approval by the FDA or any other regulatory authority.

In addition, even if we were to obtain approval, the FDA may approve any of our product candidates for fewer or more limited indications, or a more limited patient population, than we request, may grant approval contingent on the performance of costly post-marketing clinical trials, or may approve a product candidate with a label that does not include the labeling claims we believe are necessary or desirable for the successful commercialization of such product candidates. Any of the foregoing scenarios could materially harm the commercial prospects for our product candidates.

In addition, the FDA or comparable foreign regulatory authorities may change their policies, issue additional regulations, revise existing regulations or take other actions that may prevent or delay approval of our future products under development on a timely basis. Such policy or regulatory changes could impose additional requirements upon us that could delay our ability to obtain approvals, increase the costs of compliance or restrict our ability to maintain any marketing authorizations we may have obtained.

17

Table of Contents

***Clinical development involves a lengthy and expensive process with uncertain outcomes. We may incur additional costs and experience delays or an inability in developing and commercializing our current and future product candidates.***

     To obtain the requisite regulatory approvals to commercialize any of our product candidates, we must demonstrate through extensive preclinical studies and clinical trials that our product candidates are safe, pure and potent in humans. Clinical testing is expensive and can take many years to complete, and its outcome is highly uncertain. Failure can occur at any time during the clinical trial process and our future clinical trial results may not be successful. We may experience delays in completing our clinical trials or preclinical studies and initiating or completing additional clinical trials. Although we initiated a Phase 1/2 clinical trial of NC318 in October 2018, we may experience delays in initiating or completing our planned clinical trials and development efforts. Additionally, we cannot be certain the ongoing and planned preclinical studies or clinical trials for NC318, NC410 or any future product candidates will begin on time, not require redesign, enroll an adequate number of subjects on time or be completed on schedule, if at all. We may also experience numerous unforeseen events during our clinical trials that could delay or prevent our ability to receive marketing approval or commercialize the product candidates we develop, including:

- the FDA or other regulatory authorities, Institutional Review Boards, or IRBs, or independent ethics committees may not authorize us or our investigators to commence a clinical trial or conduct a clinical trial at a prospective trial site;

- the FDA or other regulatory authorities may require us to submit additional data such as long-term toxicology studies, or impose other requirements on us, before permitting us to initiate a clinical trial;

- we may experience delays in reaching, or fail to reach, agreement on acceptable terms with prospective trial sites and prospective contract research organizations, or CROs, as the terms of these agreements can be subject to extensive negotiation and vary significantly among different CROs and trial sites;

- clinical trials of any product candidates may fail to show safety, purity or potency, or may produce negative or inconclusive results, which may cause us to decide, or regulators to require us, to conduct additional nonclinical studies or clinical trials or which may cause us to decide to abandon product candidate development programs;

- the number of patients required for clinical trials may be larger than we anticipate, or we may have difficulty adding a sufficient number of clinical trial sites;

- it may be difficult to enroll a sufficient number of patients, enrollment in these clinical trials may be slower than we anticipate or participants may drop out of these clinical trials or may fail to return for post-treatment follow-up at a higher rate than we anticipate;

- our CROs and other third-party contractors may fail to comply with regulatory requirements or meet their contractual obligations to us in a timely manner, or at all, or may deviate from the clinical trial protocol or drop out of the trial, which may require that we add new clinical trial sites or investigators;

- we may elect to, or regulators, IRBs or ethics committees may require that we or our investigators, suspend or terminate clinical research or trials for various reasons, including noncompliance with regulatory requirements or a finding that participants are being exposed to unacceptable health risks;

- the cost of preclinical or nonclinical testing and studies and clinical trials of any product candidates may be greater than we anticipate;

Table of Contents

- we may face hurdles in addressing subject safety concerns that arise during the course of a trial, causing us or our investigators, regulators, IRBs or ethics committees to suspend or terminate trials, or reports may arise from nonclinical or clinical testing of other cancer therapies that raise safety or efficacy concerns about our product candidates; and

- the supply or quality of materials for product candidates we develop or other materials necessary to conduct clinical trials may be insufficient or inadequate.

We could encounter delays if a clinical trial is suspended or terminated by us, or by the IRBs of the institutions in which such trials are being conducted, ethics committees or the Data Safety Monitoring Board, or DSMB, for such trial or by the FDA or other regulatory authorities. Such authorities may impose such a suspension or termination due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a product candidate, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial. Many of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of marketing approval of our product candidates. Further, the FDA or other regulatory authorities may disagree with our clinical trial design and our interpretation of data from clinical trials, or may change the requirements for approval even after they have reviewed and commented on the design for our clinical trials.

Principal investigators for our clinical trials may serve as scientific advisors or consultants to us from time to time and may receive cash or equity compensation in connection with such services. If these relationships and any related compensation result in perceived or actual conflicts of interest, or a regulatory authority concludes that the financial relationship may have affected the interpretation of the trial, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized, which could result in the delay or rejection of the marketing application we submit. Any such delay or rejection could prevent or delay us from commercializing our current or future product candidates.

If we experience delays in the completion, or termination, of any clinical trial of our product candidates, the commercial prospects of our product candidates will be harmed and our ability to generate product revenues from any of these product candidates will be delayed. In addition, any delays in completing our clinical trials will increase our costs, slow down the development and approval process for our product candidates and jeopardize our ability to commence product sales and generate revenues. Significant clinical trial delays could also allow our competitors to bring products to market before we do or shorten any periods during which we have the exclusive right to commercialize our product candidates. Any such events would impair our ability to successfully commercialize our product candidates and may harm our business and results of operations.

Any of these occurrences may significantly harm our business, financial condition and prospects. In addition, many of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of our product candidates or result in the development of our product candidates stopping early.

19

Table of Contents

***Preclinical development is uncertain. Our preclinical programs may experience delays or may never advance to clinical trials, which would adversely affect our ability to obtain regulatory approvals or commercialize these programs on a timely basis or at all.***

      With the exception of NC318, all of our product candidates are still in the preclinical discovery stage, and the risk of failure for such product candidates is high. In order to obtain FDA approval to market a new biologic we must demonstrate proof of safety, purity and potency, including efficacy, in humans. To meet these requirements we will have to conduct adequate and well-controlled clinical trials. Before we can commence clinical trials for a product candidate, we must complete extensive preclinical testing and studies that support our planned INDs in the United States. We cannot be certain of the timely completion or outcome of our preclinical testing and studies and cannot predict if the FDA will accept our proposed clinical programs or if the outcome of our preclinical testing and studies will ultimately support the further development of our current or future product candidates. As a result, we cannot be sure that we will be able to submit INDs or similar applications for our preclinical programs on the timelines we expect, if at all, and we cannot be sure that submission of INDs or similar applications will result in the FDA or other regulatory authorities allowing clinical trials to begin.

      Conducting preclinical testing is a lengthy, time-consuming and expensive process. The length of time of such testing may vary substantially according to the type, complexity and novelty of the program, and often can be several years or more per program. Delays associated with programs for which we are conducting preclinical testing and studies may cause us to incur additional operating expenses. Moreover, we may be affected by delays associated with the preclinical testing and studies of certain programs that are the responsibility of Lilly or our potential future collaborators over which we have no control. The commencement and rate of completion of preclinical studies and clinical trials for a product candidate may be delayed by many factors, including but not limited to:

- an inability to generate sufficient preclinical or other *in vivo* or *in vitro* data to support the initiation of clinical studies;

- delays in reaching a consensus with regulatory agencies on study design; and

- the FDA not permitting the reliance on preclinical or other data from published scientific literature.

***The results of preclinical studies and early-stage clinical trials may not be predictive of future results. We have only recently initiated our first-in-human clinical trial of NC318 and do not expect to complete the Phase 1 portion of that trial until the fourth quarter of 2019. Initial success in our ongoing clinical trial may not be indicative of results obtained when these trials are completed or in later stage trials.***

      The results of preclinical studies may not be predictive of the results of clinical trials. Preclinical studies and early-stage clinical trials are primarily designed to test safety, to study pharmacokinetics and pharmacodynamics and to understand the side effects of product candidates at various doses and schedules, and the results of any early-stage clinical trials may not be predictive of the results of later-stage, large-scale efficacy clinical trials. In addition, initial success in clinical trials may not be indicative of results obtained when such trials are completed. There can be no assurance that any of our current or future clinical trials will ultimately be successful or support further clinical development of any of our product candidates. There is a high failure rate for drugs and biologics proceeding through clinical trials. A number of companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in clinical development even after achieving promising results in earlier studies, and any such setbacks in our clinical development could have a material adverse effect on our business and operating results.

      Even if our clinical trials are completed, the results may not be sufficient to obtain regulatory approval for our product candidates. Data obtained from preclinical and clinical activities are subject to varying interpretations, which may delay, limit or prevent regulatory approval. In addition, the results of our preclinical studies may not be predictive of the results of outcomes in human clinical trials. For example,

20

Table of Contents

our current or future product candidates may demonstrate different chemical, biological and pharmacological properties in patients than they do in laboratory studies or may interact with human biological systems in unforeseen or harmful ways. Product candidates in later stages of clinical trials may fail to show desired pharmacological properties or produce the necessary safety and efficacy results despite having progressed through preclinical studies and initial clinical trials. Even if we are able to initiate and complete clinical trials, the results may not be sufficient to obtain regulatory approval for our product candidates. In addition, we may experience regulatory delays or rejections as a result of many factors, including changes in regulatory policy during the period of our product candidate development. Any such delays could negatively impact our business, financial condition, results of operations and prospects.

*Interim and preliminary results from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit, validation and verification procedures that could result in material changes in the final data.*

From time to time, we may publish interim data, including interim top-line results or preliminary results from our clinical trials. Interim data and results from our clinical trials are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Preliminary or top-line results also remain subject to audit, validation and verification procedures that may result in the final data being materially different from the interim and preliminary data we previously published. As a result, interim and preliminary data may not be predictive of final results and should be viewed with caution until the final data are available. Differences between preliminary or interim data and final data could significantly harm our business prospects and may cause the trading price of our common stock to fluctuate significantly.

*Our approach to the discovery and development of product candidates using our FIND-IO platform is unproven and may not result in marketable products.*

The success of our business depends in part upon our ability to identify targets based on our proprietary FIND-IO platform and to develop and commercialize immunomedicines. Our approach to the discovery of targets using the FIND-IO platform is novel. We have not yet initiated or completed a clinical trial of any product candidate developed for a target identified from the FIND-IO platform. The platform may fail to accurately identify targets that modulate the immune system and are appropriate for immunomedicines. Even if we are able to identify targets from the FIND-IO platform and to develop corresponding product candidates, we cannot assure that such product candidates will achieve marketing approval to safely and effectively treat cancer or other disease states.

If we uncover any previously unknown risks related to our FIND-IO platform, or if we experience unanticipated problems or delays in developing our FIND-IO product candidates, we may be unable to achieve our strategy of building an oncology pipeline of novel targets for new immunomedicines focused on non-responders, or meet our obligations under the Lilly Agreement.

*Our current or future product candidates may cause undesirable side effects or have other properties when used alone or in combination with other approved products or investigational new drugs that could halt their clinical development, prevent their marketing approval, limit their commercial potential or result in significant negative consequences.*

Before obtaining regulatory approvals for the commercial sale of our product candidates, we must demonstrate through lengthy, complex and expensive preclinical testing and clinical trials that our product candidates are safe, pure and potent for use in each target indication, and failures can occur at any stage of testing. As with most biologics, use of our current or future product candidates could be associated with side effects or adverse events which can vary in severity from minor reactions to death and in frequency from infrequent to prevalent. There have been serious adverse side effects reported in response to immunotherapies in oncology. Immune-related adverse events that represent immune effects on normal

21

Table of Contents

tissue that can result from misdirected stimulation of the immune system are the most likely class of toxicity, and additional adverse side effects could develop.

We have only recently initiated a Phase 1/2 clinical trial of NC318, and it is likely that there will be side effects associated with its use. NC318 is an immunomedicine, and although no specific toxicities were identified during preclinical testing, it is possible that immune-related adverse events associated with other immunotherapies may occur in patients treated with NC318. Possible adverse side effects that could occur with treatment with immunotherapeutic products include an immunologic reaction early after administration which, while not necessarily adverse to the patient's health, could substantially limit the effectiveness of the treatment. In addition to any potential side effects caused by the product or product candidate, the administration process or related procedures also can cause adverse side effects. If any such adverse events occur, our clinical trials or any future marketing authorization could be suspended or terminated.

If unacceptable side effects arise in the development of our product candidates, we, the FDA, the IRBs at the institutions in which our studies are conducted or the DSMB could suspend or terminate our clinical trials or the FDA or comparable foreign regulatory authorities could order us to cease clinical trials or deny approval of our product candidates for any or all targeted indications. Treatment-related side effects could also affect patient recruitment or the ability of enrolled patients to complete any of our clinical trials or result in potential product liability claims. In addition, these side effects may not be appropriately recognized or managed by the treating medical staff. We expect to have to train medical personnel using our product candidates to understand the side effect profiles for our clinical trials and upon any commercialization of any of our product candidates. Inadequate training in recognizing or managing the potential side effects of our product candidates could result in patient injury or death. Any of these occurrences may harm our business, financial condition and prospects significantly.

Although our current and future product candidates have undergone and will undergo safety testing to the extent possible and, where applicable, under such conditions discussed with regulatory authorities, not all adverse effects of drugs can be predicted or anticipated. Immunomedicines and their method of action of harnessing the body's immune system are powerful and could lead to serious side effects that we only discover in clinical trials or during commercial marketing. Unforeseen side effects could arise either during clinical development or after our product candidates have been approved by regulatory authorities and the approved product has been marketed, resulting in the exposure of additional patients. So far, we have not demonstrated that NC318, NC410 or any other product candidate is safe in humans, and we cannot predict if ongoing or future clinical trials will do so. If any of our current or future product candidates fail to demonstrate safety and efficacy in clinical trials or do not gain marketing approval, we will not be able to generate revenue and our business will be harmed.

In addition, even if we successfully advance one of our product candidates into and through clinical trials, such trials will likely only include a limited number of subjects and limited duration of exposure to our product candidates. As a result, we cannot be assured that adverse effects of our product candidates will not be uncovered when a significantly larger number of patients are exposed to the product candidate. Further, any clinical trial may not be sufficient to determine the effect and safety consequences of taking our product candidates over a multi-year period.

If any of our product candidates receives marketing approval, and we or others later identify undesirable side effects caused by such products, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw their approval of the product;

- we may be required to recall a product or change the way such product is administered to patients;

- additional restrictions may be imposed on the marketing of the particular product or the manufacturing processes for the product or any component thereof;

22

Table of Contents

- regulatory authorities may require the addition of labeling statements, such as a "black box" warning or a contraindication;

- we may be required to implement a Risk Evaluation and Mitigation Strategy, or REMS, or create a Medication Guide outlining the risks of such side effects for distribution to patients;

- we could be sued and held liable for harm caused to patients;

- the product may become less competitive; and

- our reputation may suffer.

Any of the foregoing events could prevent us from achieving or maintaining market acceptance of the particular product candidate, if approved, and result in the loss of significant revenues, which would materially harm our business. In addition, if one or more of our product candidates or our immunotherapeutic development approach generally prove to be unsafe, our entire technology platform and pipeline could be affected, which would also materially harm our business.

*As an organization, we have limited experience designing and implementing clinical trials and we have never conducted pivotal clinical trials. Failure to adequately design a trial, or incorrect assumptions about the design of the trial, could adversely affect the ability to initiate the trial, enroll patients, complete the trial, or obtain regulatory approval on the basis of the trial results, as well as lead to increased or unexpected costs and in delayed timelines.*

The design and implementation of clinical trials is a complex process. We have limited experience designing and implementing clinical trials, and we may not successfully or cost-effectively design and implement clinical trials that achieve our desired clinical endpoints efficiently, or at all. A clinical trial that is not well designed may delay or even prevent initiation of the trial, can lead to increased difficulty in enrolling patients, may make it more difficult to obtain regulatory approval for the product candidate on the basis of the study results, or, even if a product candidate is approved, could make it more difficult to commercialize the product successfully or obtain reimbursement from third-party payors. Additionally, a trial that is not well-designed could be inefficient or more expensive than it otherwise would have been, or we may incorrectly estimate the costs to implement the clinical trial, which could lead to a shortfall in funding. We also expect to continue to rely on third parties to conduct our pivotal clinical trials. See "—Risks Related to Reliance on Third Parties—We rely or will rely on third parties to help conduct our ongoing and planned preclinical studies and clinical trials for NC318, NC410 and any future product candidates we develop. If these third parties do not successfully carry out their contractual duties, comply with regulatory requirements or meet expected deadlines, we may not be able to obtain marketing approval for or commercialize NC318, NC410 and any future product candidates we develop, and our business could be materially harmed." Consequently, we may be unable to successfully and efficiently execute and complete necessary clinical trials in a way that leads to BLA submission and approval of NC318, NC410 or future product candidates. We may require more time and incur greater costs than our competitors and may not succeed in obtaining regulatory approvals of product candidates that we develop.

*If we or our collaborators encounter difficulties enrolling patients in our clinical trials, our clinical development activities could be delayed or otherwise be adversely affected.*

The successful and timely completion of clinical trials in accordance with their protocols depends on, among other things, our ability to enroll a sufficient number of patients who remain in the trial until the trial's conclusion, including any follow-up period. We may experience difficulties in patient enrollment in our clinical trials for a variety of reasons. The enrollment of patients depends on many factors, including:

- the patient eligibility criteria defined in the protocol;

- the nature and size of the patient population required for analysis of the trial's primary endpoints and the process for identifying patients;

23

Table of Contents

- the number and location of participating clinical sites or patients;

- the design of the trial;

- our ability to recruit clinical trial investigators with the appropriate competencies and experience;

- clinicians' and patients' perceptions as to the potential advantages and risks of the product candidate being studied in relation to other available therapies, including any new products that may be approved for the indications we are investigating;

- the availability of competing commercially available therapies and other competing drug candidates' clinical trials;

- our ability to obtain and maintain patient informed consents for participation in our clinical trials; and

- the risk that patients enrolled in clinical trials will drop out of the trials before completion or, because they may be late-stage cancer patients, will not survive the full terms of the clinical trials.

In addition, our clinical trials will compete with other clinical trials for product candidates that are in the same therapeutic areas as our current and potential future product candidates. This competition will reduce the number and types of patients available to us, because some patients who might have opted to enroll in our trials may instead opt to enroll in a trial conducted by one of our competitors. Since the number of qualified clinical investigators is limited, we expect to conduct some of our clinical trials at the same clinical trial sites that some of our competitors use, which will reduce the number of patients who are available for our clinical trials at such sites. Moreover, because our current and potential future product candidates may represent a departure from more commonly used methods for cancer treatment, potential patients and their doctors may be inclined to use conventional therapies, such as chemotherapy, rather than enroll patients in our ongoing or any future clinical trial.

Delays of difficulties in patient enrollment may result in increased costs or may affect the timing, outcome or completion of clinical trials, which would adversely affect our ability to advance the development of the product candidates we develop.

*Because the number of subjects in our Phase 1/2 clinical trial of NC318 is small, the results from this trial, once completed, may be less reliable than results achieved in larger clinical trials.*

A study design that is considered appropriate includes a sufficiently large sample size with appropriate statistical power, as well as proper control of bias, to allow a meaningful interpretation of the results. The preliminary results of studies with smaller sample sizes, such as our ongoing Phase 1/2 clinical trial of NC318, can be disproportionately influenced by the impact the treatment had on a few individuals, which limits the ability to generalize the results across a broader community, thus making the study results less reliable than studies with a larger number of subjects. As a result, there may be less certainty that NC318 would achieve a statistically significant effect in any future clinical trials. If we conduct any future clinical trials of NC318, we may not achieve a statistically significant result or the same level of statistical significance seen, if any, in our Phase 1/2 clinical trial. Similarly, if we conduct a clinical trial of any other product candidate we develop, including NC410, with a smaller sample size, the results of any such trial may be less reliable than results achieved in larger clinical trials and may provide less certainty of achieving statistically significant effects in any future clinical trials.

*We may be required to suspend, repeat or terminate our clinical trials if they are not conducted in accordance with regulatory requirements, the results are negative or inconclusive or the trials are not well designed.*

Clinical trials must be conducted in accordance with the FDA's current good clinical practices requirements, or cGCP, or analogous requirements of applicable foreign regulatory authorities. Clinical trials are subject to oversight by the FDA, other foreign governmental agencies and IRBs or ethical

24

Table of Contents

***We may become involved in lawsuits to protect or enforce our intellectual property, which could be expensive, time-consuming and unsuccessful.***

Competitors may infringe our patents or the patents of our licensors, or we may be required to defend against claims of infringement. Countering infringement or unauthorized use claims or defending against claims of infringement can be expensive and time-consuming. Even if resolved in our favor, litigation or other legal proceedings relating to intellectual property claims may cause us to incur significant expenses and could distract our technical and management personnel from their normal responsibilities. In addition, there could be public announcements of the results of hearings, motions or other interim proceedings or developments, and if securities analysts or investors perceive these results to be negative, it could have a substantial adverse effect on the price of our common stock. Such litigation or proceedings could substantially increase our operating losses and reduce the resources available for development activities or any future marketing, sales or distribution activities. We may not have sufficient financial or other resources to adequately conduct such litigation or proceedings. Some of our competitors may be able to sustain the costs of such litigation or proceedings more effectively than we can because of their greater financial resources and more mature and developed intellectual property portfolios. Uncertainties resulting from the initiation and continuation of patent litigation or other proceedings could have a material adverse effect on our ability to compete in the marketplace.

In addition, many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents, trade secrets and other intellectual property, particularly those relating to biotechnology products, which could make it difficult for us to stop the infringement of our patents or marketing of competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions could result in substantial costs and divert our efforts and attention from other aspects of our business, could put our patents at risk of being invalidated or interpreted narrowly and our patent applications at risk of not issuing and could provoke third parties to assert claims against us. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful. Accordingly, our efforts to enforce our intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we own, develop or license.

***Issued patents covering our product candidates could be found invalid or unenforceable if challenged in court. We may not be able to protect our trade secrets in court.***

If we or one of our licensing partners initiate legal proceedings against a third party to enforce any patent that is issued covering one of our product candidates, the defendant could counterclaim that the patent covering our product candidate is invalid or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity or unenforceability are commonplace. Grounds for a validity challenge could be an alleged failure to meet any of several statutory requirements, including lack of novelty, obviousness, written description or non-enablement. In addition, patent validity challenges may, under certain circumstances, be based upon non-statutory obviousness-type double patenting, which, if successful, could result in a finding that the claims are invalid for obviousness-type double patenting or the loss of patent term, including a patent term adjustment granted by the USPTO, if a terminal disclaimer is filed to obviate a finding of obviousness-type double patenting. Grounds for an unenforceability assertion could be an allegation that someone connected with prosecution of the patent withheld information material to patentability from the USPTO, or made a misleading statement, during prosecution. Third parties also may raise similar claims before administrative bodies in the United States or abroad, even outside the context of litigation. Such mechanisms include re-examination, post grant review, *inter partes* review and equivalent proceedings in foreign jurisdictions. Such proceedings could result in the revocation or cancellation of or amendment to our patents in such a way that they no longer cover our product candidates. The outcome following legal assertions of invalidity and unenforceability is unpredictable. We

44

Table of Contents

cannot be certain that there is no invalidating prior art of which the patent examiner and we or our licensing partners were unaware during prosecution. If a defendant were to prevail on a legal assertion of invalidity or unenforceability, we could lose part, and perhaps all, of the patent protection on one or more of our product candidates. Such a loss of patent protection could have a material adverse impact on our business.

In addition to the protection afforded by patents, we rely on trade secret protection and confidentiality agreements to protect proprietary know-how that is not patentable or that we elect not to patent, processes for which patents are difficult to enforce and any other elements of our product candidate discovery and development processes that involve proprietary know-how, information or technology that is not covered by patents, including portions of our FIND-IO platform. However, trade secrets can be difficult to protect, and some courts inside and outside the United States are less willing or unwilling to protect trade secrets.

*Third parties may initiate legal proceedings alleging that we are infringing their intellectual property rights, the outcome of which would be uncertain and could have a material adverse effect on the success of our business and financial condition.*

Our commercial success depends upon our ability and the ability of any collaborators to develop, manufacture, market and sell our product candidates and use our proprietary technologies without infringing the proprietary rights and intellectual property of third parties. We cannot provide any assurances that third-party patents do not exist which might be enforced against our current manufacturing methods, product candidates or future methods or products, resulting in either an injunction prohibiting our manufacture or sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

The biotechnology and pharmaceutical industries are characterized by extensive and complex litigation regarding patents and other intellectual property rights. We may in the future become party to, or be threatened with, adversarial proceedings or litigation regarding intellectual property rights with respect to our product candidates and technology, including post grant review and *inter partes* review before the USPTO. The risks of being involved in such litigation and proceedings may also increase as our product candidates approach commercialization and as we gain greater visibility as a public company. Third parties may assert infringement claims against us based on existing patents or patents that may be granted in the future, regardless of their merit. There is a risk that third parties may choose to engage in litigation with us to enforce or to otherwise assert their patent rights against us. Even if we believe such claims are without merit, a court of competent jurisdiction could hold that these third-party patents are valid, enforceable and infringed, which could materially and adversely affect our ability to commercialize any of our product candidates or technologies covered by the asserted third-party patents.

If we are found to infringe a third party's valid and enforceable intellectual property rights, we could be required to obtain a license from such third party to continue developing, manufacturing and marketing our product candidates and technology. However, we may not be able to obtain any required license on commercially reasonable terms or at all. Even if we were able to obtain a license, it could be non-exclusive, thereby giving our competitors and other third parties access to the same technologies licensed to us, and it could require us to make substantial licensing and royalty payments. We could be forced, including by court order, to cease developing, manufacturing and commercializing the infringing technology or product candidates. In addition, we could be found liable for monetary damages, including treble damages and attorneys' fees, if we are found to have willfully infringed a patent or other intellectual property right. A finding of infringement could prevent us from manufacturing and commercializing our product candidates or force us to cease some of our business operations, which could materially harm our business. Claims that we have misappropriated the confidential information or trade secrets of third parties could have a similar negative impact on our business, financial condition, results of operations and prospects.

45

Table of Contents

***Others may claim an ownership interest in our intellectual property and our product candidates, which could expose us to litigation and have a significant adverse effect on our prospects.***

While we are presently unaware of any claims or assertions by third parties with respect to our patents or other intellectual property, we cannot guarantee that a third party will not assert a claim or an interest in any of such patents or intellectual property. For example, a third party may claim an ownership interest in one or more of our, or our licensors', patents or other proprietary or intellectual property rights. A third party could bring legal actions against us to seek monetary damages or enjoin clinical testing, manufacturing or marketing of the affected product candidate or product. If we become involved in any litigation, it could consume a substantial portion of our resources and cause a significant diversion of effort by our technical and management personnel. If any such action is successful, in addition to any potential liability for damages, we could be required to obtain a license to continue to manufacture or market the affected product candidate or product, in which case we could be required to pay substantial royalties or grant cross-licenses to patents. We cannot, however, assure you that any such license would be available on acceptable terms, if at all. Ultimately, we could be prevented from commercializing a product, or forced to cease some aspect of our business operations as a result of claims of patent infringement or violation of other intellectual property rights. Further, the outcome of intellectual property litigation is subject to uncertainties that cannot be adequately quantified in advance, including the demeanor and credibility of witnesses and the identity of any adverse party. This is especially true in intellectual property cases, which may turn on the testimony of experts as to technical facts upon which experts may reasonably disagree. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations or prospects.

***If we are unable to protect the confidentiality of our proprietary information, the value of our technology and products could be adversely affected.***

Trade secrets and know-how can be difficult to protect. To maintain the confidentiality of trade secrets and proprietary information, we enter into confidentiality agreements with our employees, consultants, collaborators and others upon the commencement of their relationships with us. These agreements require that all confidential information developed by the individual or made known to the individual by us during the course of the individual's relationship with us be kept confidential and not disclosed to third parties. Our agreements with employees and our personnel policies also provide that any inventions conceived by the individual in the course of rendering services to us shall be our exclusive property. However, we cannot guarantee that we have entered into such agreements with each party that may have or have had access to our trade secrets or proprietary technology and processes, and individuals with whom we have these agreements may not comply with their terms. Thus, despite such agreement, there can be no assurance that such inventions will not be assigned to third parties. In the event of unauthorized use or disclosure of our trade secrets or proprietary information, these agreements, even if obtained, may not provide meaningful protection, particularly for our trade secrets or other confidential information. To the extent that our employees, consultants or contractors use technology or know-how owned by third parties in their work for us, disputes may arise between us and those third parties as to the rights in related inventions. To the extent that an individual who is not obligated to assign rights in intellectual property to us is rightfully an inventor of intellectual property, we may need to obtain an assignment or a license to that intellectual property from that individual, or a third party or from that individual's assignee. Such assignment or license may not be available on commercially reasonable terms or at all. We also seek to preserve the integrity and confidentiality of our trade secrets by other means, including maintaining physical security of our premises and physical and electronic security of our information technology systems. However, these security measures may be breached, and we may be forced to bring claims against third parties, or defend claims that they may bring against us, to determine the ownership of what we regard as our intellectual property.

46

Table of Contents

Adequate remedies may not exist in the event of unauthorized use or disclosure of our proprietary information. The disclosure of our trade secrets would impair our competitive position and may materially harm our business, financial condition and results of operations. Costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights, and failure to maintain trade secret protection could adversely affect our competitive business position. In addition, others may independently discover or develop our trade secrets and proprietary information, and the existence of our own trade secrets affords no protection against such independent discovery. For example, a public presentation in the scientific or popular press on the properties of our product candidates could motivate a third party, despite any perceived difficulty, to assemble a team of scientists having backgrounds similar to those of our employees to attempt to independently reverse engineer or otherwise duplicate our antibody technologies to replicate our success.

*We may be subject to claims asserting that our employees, consultants or advisors have wrongfully used or disclosed alleged trade secrets of their current or former employers.*

Many of our employees, consultants or advisors are currently, or were previously, employed at universities or other biotechnology or pharmaceutical companies, including our competitors or potential competitors. Although we try to ensure that our employees, consultants and advisors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that these individuals, or we, have used or disclosed intellectual property, including trade secrets or other proprietary information, of any such individual's current or former employer, or that patents and applications we have filed to protect inventions of these employees, even those related to one or more of our product candidates, are rightfully owned by their former or current employer. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management.

*If our trademarks and trade names are not adequately protected, then we may not be able to build name recognition in our markets of interest and our business may be adversely affected.*

Any registered trademarks or trade names may be challenged, circumvented or declared generic or determined to be infringing on other marks. We may not be able to protect our rights to these trademarks and trade names, which we need to build name recognition among potential partners or customers in our markets of interest. At times, competitors may adopt trade names or trademarks similar to ours, thereby impeding our ability to build brand identity and possibly leading to market confusion. In addition, there could be potential trade name or trademark infringement claims brought by owners of other registered trademarks or trademarks that incorporate variations of our registered or unregistered trademarks or trade names. Over the long term, if we are unable to establish name recognition based on our trademarks and trade names, then we may not be able to compete effectively and our business may be adversely affected. Our efforts to enforce or protect our proprietary rights related to trademarks, trade secrets, domain names, copyrights or other intellectual property may be ineffective and could result in substantial costs and diversion of resources and could adversely impact our financial condition or results of operations.

*Intellectual property rights do not necessarily address all potential threats.*

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business or permit us to maintain our competitive advantage. For example:

- others may be able to make products that are similar to our product candidates but that are not covered by the claims of the patents that we own or license or may own in the future;

47

Table of Contents





*S15 Target Validation*

We believe S15 represents a novel target for the treatment of cancer. We and others have conducted multiple preclinical studies in various animal models evaluating the effect of inhibiting S15 by knocking out the gene responsible for producing S15 in mice. Across these studies, we observed that mice in which S15 is absent have generally developed normally, suggesting that the inhibition of S15 is not associated with adverse effects on normal cells. In subsequent studies, we observed that S15 knockout mice mounted enhanced antigen-specific T cell responses *in vivo* as compared with wild-type mice, as shown in the following figure. In addition, when S15 was knocked out in myeloid-derived cells, reflected as conditional knockout in the figure below, the mice mounted an enhanced antigen-specific T cell response similar to that of the knockout mice, which suggests the key role that macrophages play in S15-mediated immunosuppression. The data show a statistically significant increase in antigen-specific T cells in knockout and conditional knockout mice as compared to wild-type mice, and the increase is prolonged and maintained over a longer period than in the wild-type mice. In addition, we observed a significant increase in antigen-specific T cells in the spleen, as measured by the percentage of OVA+ CD8+ cells among CD8+ cells. The knockout mice showed an increase of nearly 20% as compared to less than 2% in wild-type mice. This suggests that S15 plays a key role in mediating immune suppression and the absence or inhibition of S15 could restore normal immune function.

91



**Increase in T Cells Observed When S15 is Absent**

_____

(1)    The p-value, or probability value, cited in figures in this prospectus as "p," is the likelihood that an observed result occurred by chance. The smaller the p-value, the less likely that chance caused the result. A result that is sufficiently unlikely to have occurred by chance is referred to as being statistically significant. The FDA generally considers a p-value of less than or equal to 0.05, meaning that there is a 5% or less chance that the results occurred by chance, to be statistically significant.

We also evaluated tumor progression in S15 knockout mice compared to wild-type mice in a glioma tumor model. As shown in the figures below, the knockout group showed delayed tumor progression as well as a corresponding increase in survival as compared to the wild-type group.

**Knocking Out S15 Delayed Tumor Progression and Prolonged Survival in Glioma Model**



In order to study the potential benefit of S15 inhibition in non-responders to PD-1/PD-L1 therapies, we conducted a preclinical study evaluating S15 knockout mice in a frequently used melanoma model, the B16.GMCSF tumor model, which has been demonstrated to be resistant to PD-1/PD-L1 therapy. We observed that S15 knockout mice demonstrated greater anti-tumor effect and, as shown in the following figure, had better overall survival than wild-type mice. We believe that this study suggests NC318 may have therapeutic potential in patients who do not respond to checkpoint inhibitors.