UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

YE ZHOU, Individually and on Behalf of All
Others Similarly Situated

                    Plaintiff,

         -against-

NEXTCURE, INC., MICHAEL RICHMAN,
STEVEN P. COBOURN, KEVIN N.
HELLER, M.D., DAVID KABAKOFF, PH.D.,
ELAINE V. JONES, PH.D., CHAU Q.
KHUONG, JUDITH J. LI, BRIGGS
MORRISON, M.D., TIM SHANNON, M.D.,
STEPHEN WEBSTER, STELLA XU,
MORGAN STANLEY & CO. LLC, BOFA
SECURITIES, INC., PIPER JAFFRAY &
CO., NEEDHAM & COMPANY, LLC, AND
BTIG, LLC,

                  Defendants

20-CV-07772-LTS-RWL

---

### MEMORANDUM OPINION AND ORDER

       Ye Zhou ("Plaintiff") brings this proposed class action against NextCure, Inc.

("NextCure"), Michael Richman ("Richman"), Steven Cobourn, and Kevin Heller (collectively,

the "Individual Exchange Act Defendants"), David Kabakoff, Elaine V. Jones, Chau Q. Khuong,

Judith J. Li, Briggs Morrisson, Stephen Webster, and Stella Xu (collectively, with the Individual

Exchange Act Defendants, the "Officer Defendants"), Morgan Stanley & Co.,  BofA Securities,

Inc. (formerly known as Merrill Lynch, Pierce, Fenner & Smith, Inc.), Piper Jaffray & Co.,

Needham & Company, LLC, and BTIG, LLC (collectively, the "Underwriter Defendants"),

asserting claims for violations of section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)) and 17 C.F.R. § 240.10b-5 ("Rule 10b-5"),

section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), section 11 of the

Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77k ("Section 11"), 15 U.S.C. § 77*l*,

("Section 12(a)"), and section 15 of the Securities Act, 15 U.S.C. § 77o.  (Docket entry no. 34

(the "Amended Complaint" or "AC").)  Defendants NextCure and the Officer Defendants are

joined by the Underwriter Defendants (collectively, the "Moving Defendants") in moving to

dismiss the AC pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private

Securities Litigation Reform Act, 15 U.S.C. § 78u-4 et seq. ("PSLRA").  (Docket entry no. 39

("Defs. Mem.").)

 The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1331 and

15 U.S.C. sections 77v and 78aa.

 The Court has considered the parties' submissions carefully and, for the following

reasons, grants the Moving Defendants' motion to dismiss the Amended Complaint.


BACKGROUND

 Unless otherwise indicated, the following allegations are taken from the Amended

Complaint and are presumed true for the purposes of this motion.  NextCure is a

biopharmaceutical company that uses a three-dimensional imaging platform, known as FIND-IO,

to develop immune-oncology therapies.  (AC ¶ 33.)  According to NextCure, FIND-IO was

developed by Lipeing Chen, Ph.D. ("Dr. Chen"), one of NextCure's co-founders.  (Id. ¶ 34.)

NextCure's leading product candidate, called NC318, was a drug designed to block the

immunosuppressive properties of Siglec-15 ("S15"), a protein present on some cancerous tumors

that was originally discovered by Dr. Chen using a predecessor platform to FIND-IO.  (AC ¶ 37.)

 In October 2018, NextCure initiated Phase 1 of a clinical, first-in-human trial for

NC318 (the "Phase 1 Trial" or the "Trial").  (AC ¶ 40.)  The Trial involved a small number of

patients from a variety of cancer cohorts, including Non-small Cell Lung Cancer ("NSCLC"),

Ovarian Cancer, and others.  (Id. ¶ 41.)  The Phase 1 Trial "was designed to assess the safety and

tolerability of NC318, to define the maximum tolerable dose (MTD) or pharmacologically active

dose of NC318, and to assess preliminary efficacy."  (Id. ¶ 43.)  This is consistent with FDA

guidelines, which hold that Phase 1 trials are designed to "determine the metabolism and

pharmacologic actions of the drug in humans, the side effects associated with increasing doses,

and, if possible, to gain early evidence on effectiveness."  21 C.F.R. § 312.21(a).  One month

later, Eli Lilly & Co. ("Eli Lilly"), a pharmaceutical company, signed a multi-year collaboration

agreement with NextCure to use the FIND-IO platform to develop new treatments.  (AC ¶ 36.)

On May 9, 2019, with the Phase 1 Trial ongoing, NextCure issued an IPO

prospectus.  (AC ¶ 45; see also docket entry no. 41 (the "Artaki Decl."), Ex. E. (the

"Prospectus"), incorporated by reference in AC ¶ 45.)  The Prospectus included statements

regarding the FIND-IO platform that Plaintiff characterizes as "false and misleading."  (AC at

47.)  These statements include descriptions of FIND-IO as "proprietary" and allowing for a

"novel" approach to the discovery of targets for immunotherapy.  (Id. ¶ 45.)  The Prospectus

described FIND-IO's creation as "the result of our industrialization, expansion and optimization

of a predecessor platform that Dr. Chen used to discover the immunosuppressive properties of

S15."  (Id. ¶ 46.)

On November 5, 2019, NextCure issued an Abstract (the "Abstract") summarizing

the design and interim results of the Phase 1 Trial through the Journal for Immunotherapy of

Cancer (the "Journal"), an industry medical journal.  (AC ¶ 8.)  The Abstract was published to

preview "interim results [from the Phase I Trial] that would be presented at the Society of

ImmunoTherapy of Cancer (SITC) conference[.]"  (AC ¶ 77.)  The Abstract described the Trial

as a "non-randomized study to determine the safety and tolerability, define the maximum

tolerated dose or pharmacologically active doses, and assess the primary efficacy of NC318."

(Artaki Decl., Ex. C., incorporated by reference in AC ¶ 49.)  In a section titled "Results," the Abstract stated that, [a]s of August 2019, 43 patients have been dosed across 6 cohorts . . . [t]he most common tumor types enrolled include [] 10 NSCLC."  (Id.)  The Abstract further reported that, among those 43 patients, "[t]umor responses were evaluable in 32 patients," but "11 patients have not reached their first assessment, and their efficacy data will be reported at the conference," and that "[s]ingle agent activity[1] has been seen in NSCLC including 1 CR[2] (ongoing at 41 weeks), a PR[3] (ongoing at 14 weeks), 1 stable disease with tumor reduction (ongoing for 26 weeks), and 2 with stable disease. NSCLC BORR[4]: 2/7 or 29%. DCR[5] 5/7 or 71%."  (Id. (emphasis added).)  The BORR and DCR totals indicated that NextCure reported an evaluable NSCLC cohort of seven patients and that, of those seven, two experienced either a

---

[1]    Single Agent Activity means apparent impact on targeted tumors by a single therapy, in this case NC318.  See Carrick et al., Single agent versus combination chemotherapy for metastatic breast cancer, Cochrane Database Syst Rev. 15 Apr. 2009 (defining single agent therapy as a single chemotherapy drug "given alone").

[2]    Complete Response means the disappearance of all signs of cancer in response to treatment.  National Cancer Institute Dictionary of Cancer Terms.  National Cancer Institute.  Available at https://www.cancer.gov/publications/dictionaries.

[3]    Partial Response means a decrease in the size of a tumor, or in the extent of cancer in the body, in response to treatment.  Such a response is also called partial remission.  Id.

[4]    Overall Response Rate means the percentage of people in a study or treatment group who have shown a partial or complete response to treatment within a certain period of time.  Id.  In Plaintiff's submissions, the acronym ORR is used interchangeably with the BORR acronym used in the Abstract.  In the interest of consistency, this opinion will use the "ORR" acronym.

[5]    Disease Control Rate means the percentage of patients with advanced or metastatic cancer who have achieved complete response, partial response, and stable disease to a therapeutic intervention in clinical trials of anticancer agents.  Mario Sznol, Reporting disease control rates or clinical benefit rates in early clinical trials of anticancer agents: useful endpoint or hype?, Current Op. in Investigational Drugs (2010).

complete or partial response, and that, for five of seven, their disease "appeared not to have worsened."  (AC ¶ 48.)

Plaintiff alleges that, "at the time of the misstatement" (presumably November 5, the day the Abstract was published), NextCure had evaluated the remaining 25 patients and had data on their responses to NC318.  (AC ¶ 49.)  Plaintiff further alleges that "[a]mong these 25 evaluable patients were three additional NSCLC patients, all of whom showed no positive results from their NC318 treatment."  (Id.)  As a result, Plaintiff alleges, "among patients with NSCLC, NextCure's ORR was not 27%,[6] but really 15%, and its DCR was not 71% but rather 46%."[7] Plaintiff does not state with particularity the facts upon which this allegation — that the three additional NSCLC patients were among the twenty-five already evaluated[8], rather than the eleven whose data was set to be reported at the conference — is based.  (Id.)

The final section of the Abstract, titled "Conclusions", described NC318 as having been "well tolerated across multiple dose levels" and having "shown encouraging anti-tumor activity when administered as monotherapy."  (Artaki Decl. Ex. C.)  Upon release of the

---

[6]     This appears to be a scrivener's error, as the ORR reported by NextCure in the Abstract was 29%, not 27%.  (Abstract at 3.)

[7]     Plaintiff appears to arrive at these totals by dividing 2/13 (for ORR) and 6/13 (for DCR). However, Plaintiff also alleges only 10 evaluable NSCLC patients at the time of the publication of the Abstract (AC ¶ 49) and appears here to be conflating the number of evaluable NSCLC patients at the time of publication of the Abstract with the number of evaluable NSCLC patients at the time of NextCure's publication of a press release on November 9, 2019, which identified 13 NSCLC patients from an evaluable total of 49 patients overall.  (See Artaki Decl. Ex. F, incorporated by reference in AC ¶ 50).

[8]     Whether Plaintiff is arguing that the additional twenty-five patients (and the three NSCLC patients it alleges were in that group) had been evaluated by August (as indicated by the text of the Abstract) or by November is unclear.  See infra at 13-14.

Abstract, NextCure's stock price rose nearly 250%, closing at $92.22, up from $26.43 the previous trading day.  (AC ¶ 8.)

On November 9, NextCure presented current data at the Conference and issued an accompanying press release (the "Press Release").[9]  (AC ¶ 77, Artaki Decl. Ex. F.)  According to the Press Release, NextCure had by then dosed 49 patients across seven cohorts.  (Artaki Decl. Ex. F., incorporated by reference in AC ¶ 50.)  The evaluable NSCLC cohort had increased to 13 patients.  (Id.)  With respect to those 13 patients, NextCure reported one complete response, one partial response, and four patients with stable disease.  (Id.)  Three additional patients did not register a response to NC318.  This lowered NextCure's ORR from 29% (2/7) to 15% (2/13) and its DCR from 71% (5/7) to 46% (6/13), casting doubt upon NC318's anti-tumor efficacy.  (Id.)  As a result, NextCure stock fell 53%, to $39.02.  (AC ¶ 9.)

During an analyst call that same day, Defendants Heller and Richman remained optimistic regarding NC318.  Defendant Heller stated that NC318 had "shown some very encouraging promise."  (AC ¶ 51.)  Defendant Richman stated that there was "some preliminary data that suggests very strongly that this is active among patients" with certain forms of NSCLC.  (Id.)  However, during this same call, Defendant Heller also cautioned analysts regarding the heterogeneity of the trial population and of the general limitations of the Phase 1 Trial, stating:

> [O]ne of the things we did in order to manage efficiency to enroll quickly [sic.] [while] also trying to get as much data as possible is that we made the biopsies for the first three patients in each dose cohort option[al], which means we didn't very often get biopsies . . . We really want to point out that of course this was all comer[s] . . . [s]o we were not optimizing the phase 1 component to look for efficacy.  Phase 1, and the objective of phase 1 is all about safety and tolerability and collecting as much data as possible so you can make a good educated guess for a recommended phase 2 dose.

---

[9]     The Press Release, like the Abstract, is incorporated by reference in the Amended Complaint.  See Tellabs, supra at 4, n.1.

(Id.)

On November 12, 2019, NextCure filed a draft Registration Statement on Form S-1 with the SEC, to be utilized for a Secondary Public Offering (the "SPO"). (AC ¶ 147.) This Registration Statement, which was declared effective two days later by the SEC, included a final Prospectus (the "SPO Prospectus"), which was filed on November 18. (Id. ¶ 148.) The SPO, which closed on November 19, 2019, offered shares in NextCure at $36.75 per share. (Id. ¶ 149.) In the SPO Prospectus, Defendants described NC318 as "hav[ing] the potential to treat multiple cancer indications" and as "well-suited to treat patients who are not responding to PD-1/PD-L1 directed cancer therapies." (Id. ¶ 151.) The SPO Prospectus reiterated the orientation of the Phase 1 Trial, noting that "[t]he Phase 1 portion was designed to determine the pharmacologically active dose . . . and/or the maximum tolerable dose of NC318, including defining the optimal dose administration schedule and the maximum number of tolerated doses." (Id.) The SPO Prospectus also contained a section regarding "Risk Factors," warning investors that:

> [p]reclinical studies and early-stage clinical trials are primarily designed to test safety, to study pharmacokinetics and pharmacodynamics and to understand the side effects of product candidates at various doses and schedules, and the results of any early-stage critical trials may not be predictive of the results of later-stage, large-scale efficacy clinical trials. In addition, initial success in clinical trials may not be indicative of results obtained when such trials are completed.

(Id. ¶ 153.) Further warnings cautioned investors that, "[b]ecause the number of subjects in our Phase 1/2 clinical trial of NC318 is small, the results from this trial, once completed, may be less reliable than results achieved in larger clinical trials." (Id. ¶ 155.) Numerous other, similar warnings were included in the SPO Prospectus. (Id. ¶¶ 153-155.)

In 2020, the prospects of NC318 and, with them, NextCure's share price, began to decline.  On January 13, 2020, NextCure announced that Lilly had terminated their agreement.  (AC ¶ 68.)  The Amended Complaint does not allege any specific basis for Lilly's decision, but notes that NextCure's share price dropped 8.29% following the announcement, closing at $52.00 on January 13, 2020.  (Id.)  Days later, on January 16, 2020, NextCure conducted a presentation at a healthcare conference (the "JPMorgan Healthcare Conference") in which NextCure and the Individual Defendants continued to make claims regarding NC318's "potential to address multiple big [cancer] indications" and its economic potential.  (AC ¶¶ 62-67.)  This did not arrest the decline of NextCure stock, which fell another 5.25%.  (AC ¶ 68.)

On February 12, 2020, another company, Immunaccel Labs ("Immunaccel"), filed suit in Delaware Chancery Court against Defendant Richman, NextCure's CEO.  (AC ¶ 69.)  Richman had served on Immunaccel's Board of Managers from 2013 to 2019, a tenure that, for approximately four years, overlapped with his employment at NextCure.  (Id.)  Immunaccel is a company that provides a "three-dimensional platform designed to study the tumor microenvironment in cancer research."  (AC ¶ 47.)  In its suit, Immunaccel alleged that Richman, while employed by both companies, "began receiving confidential information regarding Immunaccel's 3D assays and its 3D platform [which] Defendant Richman then used . . . to enable NextCure to develop [FIND-IO], effectively copying Immunaccel's 3D technology, and market [NextCure] in direct competition" to Immunaccel.  (Id.)  Immunaccel voluntarily dismissed its case, without payment of costs, on June 24, 2020.  (Artaki Decl. Ex. J.); see also

<u>Immunaccel Labs, LLC, et al. v. Richman, et. Al.</u>, C.A. No. 2020-0084-AGB (Del. Ch. June 24, 2020).[1011]

On May 29, 2020, NextCure stock dropped another 13% following the company's release of a poster summarizing its Phase 1 Trial results, which had drawn increasing skepticism from analysts. (AC ¶¶ 70, 71.) On July 13, 2020, the closing date of the putative Class period, NextCure released an "interim update" stating that the NSCLC and ovarian cancer cohorts would not advance to the second stage of clinical trials. (AC ¶ 72.) In explaining the decision, NextCure stated that "the monotherapy data in the NSCLC and ovarian cohorts was disappointing." (<u>Id.</u>) NextCure's stock price dropped to $8.15 per share. (<u>Id.</u> ¶ 78.)

D<small>ISCUSSION</small>

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007), and "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Aschroft v. Iqbal</u>, 556 U.S. 662, 663 (2009). In deciding a Rule 12(b)(6) motion to dismiss, the Court must "draw all reasonable inferences in [p]laintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." <u>Faber v. Metro. Life Ins. Co.</u>, 648 F.3d 98, 104 (2d Cir. 2011)

---

[10]   Though not incorporated by reference in the Amended Complaint, Immunaccel's Notice of Voluntary Dismissal in the action is judicially noticeable at the motion to dismiss stage. <u>See</u> <u>In re Thelen LLP</u>, 736 F.3d 213, 219 (2d Cir. 2013), <u>infra</u> at 10.

[11]   On October 3, 2022, Plaintiff filed a letter notifying the Court that Immunaccel had refiled its action against NextCure and Richman. (<u>See</u> docket entry no. 52.) For reasons detailed below, the reinstatement of the action is not material to the sufficiency of the AC. <u>See</u> <u>infra</u> at 26 n.14.

(internal quotation marks omitted).  "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."  In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013), certified question accepted sub nom. Thelen LLP v. Seyfarth Shaw LLP, 22 N.Y.3d 1017, 981 N.Y.S.2d 349 (2013), and certified question answered, 24 N.Y.3d 16 (2014) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)).  However, the Court may also appropriately take judicial notice of state court filings in deciding a motion to dismiss.  Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation and related filings.").  In assessing the sufficiency of the Amended Complaint, the Court has, accordingly, considered the content of the IPO Prospectus, the SPO Prospectus, the Abstract, and other documents referenced in the AC, as well as state court filings related to the litigation between Richman and Immunaccel.

Pleading Standards

Exchange Act Claims

To state a claim for securities fraud pursuant to Section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (internal citation omitted).

Claims alleging securities fraud are subject to heightened pleading requirements. Under Federal Rule of Civil Procedure 9(b), the complaint must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); accord ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  In satisfaction of this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Dempsey v. Vieau, 130 F. Supp. 3d 809, 814 (S.D.N.Y. 2015).  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  ATSI, 493 F.3d at 99 (citation omitted).

Under the PSLRA, plaintiffs must plead with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud."  Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007) (quotation omitted).  If an allegation regarding a statement or omission is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.A. § 78u-4(b)(1)(B).  "In the context of Section 10(b) and Rule 10b-5, an alleged misstatement or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would be viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  In re Regeneron Pharm., Inc. Sec. Litig., No. 03-CV-3111-RWS, 2005 WL 225288, at *14 (S.D.N.Y. Feb. 1, 2005) (quoting Halperin v. eBanker USA.Com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)).

Regarding scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. (quoting 15 U.S.C. § 78u-4(b)(2)).  A strong inference of scienter may thus be established in a Section 10(b) or Rule

10b-5 action if the complaint "alleg[es] facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." <u>ATSI</u>, 493 F.3d at 99 (citation omitted).  To be considered strong, "an inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." <u>Tellabs</u>, 551 U.S. at 324.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u>  In evaluating whether a complaint meets this standard, the Court must look not at individual statements or facts in isolation, but "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" <u>Id.</u> at 323 (emphasis in original).

<u>Securities Act Claims</u>

Section 11 of the Securities Act imposes strict liability on issuers and signatories, and negligence liability on underwriters, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 12(a)(2) "imposes liability under similar circumstances for misstatements or omissions in a prospectus."  <u>Barilli v. Sky Solar Holdings, Ltd.</u>, 389 F. Supp. 3d 232, 249 (S.D.N.Y. 2019) (citing 15 U.S.C. § 77k(a)(2)).  Section 15 of the Securities Act makes a "control person" liable for causing violations of Sections 11 and 12(a). 15 U.S.C. § 77o.  "Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation;

and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010).

Plaintiff's Section 10(b) and Rule 10b-5 claims are premised on a number of Defendants' statements and omissions, which can be generally summarized as falling into three categories: (1) omissions of updated Phase 1 Trial data from the November 5th Abstract; (2) statements and omissions, made in a variety of fora after November 5, 2019, generating "false optimism" regarding the efficacy of NC318, when Defendants allegedly knew that the Phase 1 Trial could not support those conclusions; and (3) statements made in the IPO and SPO Prospectuses describing the FIND-IO Platform and failing to disclose the allegedly improper nature of its development.  Plaintiff's claims under the Securities Act necessarily pertain only to the statements and alleged omissions in the registration statements and prospectuses filed by NextCure with the SEC.

Defendants argue (1) that Plaintiff fails to plead an actionable misstatement or omission under either the Securities Act or the Exchange Act (Defs. Mem. at 9); and (2) that Plaintiff fails to plead a strong inference of scienter.  (Defs. Mem. at 20.)  The Court turns first to the sufficiency of Plaintiff's claims of materially misleading statements and omissions.

Exchange Act Claims

The November 5, 2019 Abstract

Plaintiff's main contention regarding the Abstract is that NextCure failed to disclose negative response data on three additional NSCLC patients on the publication date of the Abstract, creating a misleading impression of the efficacy of NC318.  Plaintiff's specific

allegations as to this omission are confusing, and appear to contain fragments of two separate, mutually exclusive claims.

The first possible interpretation of Plaintiff's claim is that NextCure had evaluated the three additional NSCLC patients in August, but chose not to disclose that data in the Abstract. Presumably, Plaintiff draws the number of three additional patients by subtracting the number of NSCLC cohort members for whom data is given (seven) from the cohort total in the Abstract (ten).  Noting that, among the forty-three participants dosed as of August, only thirty-two participants were evaluable, Plaintiff identifies twenty-five additional evaluated participants (as of August) and contends that the three additional NSCLC patients were among the twenty-five (rather than among the eleven patients whose tumor response was, as of August, not yet evaluable).  As the reference to twenty-five remaining evaluable patients seemingly applies to the August context only (by November 5, NextCure had presumably evaluated all forty-nine patients on which it presented data at the November 9 Conference, and by then had in any case expanded its NSCLC cohort from ten to thirteen), Plaintiff seems to contend that NextCure had data on the three patients in August, and intentionally withheld it.

Confusingly, Plaintiff does not allege that NextCure had this data in August. Instead, Plaintiff asserts that, "by November 5, 2019, NextCure had a significant amount of additional negative data undercutting these representations of efficacy.  Three additional NSCLC patients had been evaluated without showing any positive results."  (AC ¶ 9; see also AC ¶ 49 ("[A]t the time of the misstatement [November 5, 2019], NextCure had data on each of the remaining 25 evaluable patients.").)  On this understanding of the allegations, Plaintiff is arguing that Defendant did not have the data on the three additional NSCLC patients in August, but obtained the data from evaluations of the three additional NSCLC patients sometime between

August and November 5, and then improperly failed to disclose the additional data in the
Abstract, leading to a false representation of the efficacy of NC318.

Under either construction, Plaintiff contends that NextCure's failure to include the
data on the three additional NSCLC patients was an actionable omission that "created a positive
impression of NC318's effectiveness . . . when, in fact, NextCure possessed additional
information that seriously undercut the representation of efficacy." (Id.)  With results from those
three additional patients, Plaintiff argues, the denominator for NC318's ORR and DCR would
increase from 7 to 10, making those ratios less impressive and demonstrating the true lack of
efficacy of NC318.[12]  Under either construction of Plaintiff's argument, Plaintiff fails to state a
claim that the statements contained in the Abstract was misleading.

If Plaintiff is arguing that NextCure had data on the three additional NSCLC
patients in August her argument fails because Plaintiff fails to plead with particularity the basis
for its assertion that those three NSCLC patients were among the twenty-five additional
evaluable patients.  "Allegations of fraud may be 'too speculative even on a motion to dismiss,'
particularly when premised on 'distorted inferences and speculations.'"  In re Delcarth Sys., Inc.
Sec. Litig., 36 F. Supp. 3d 320, 331 (S.D.N.Y. 2014) (quoting ATSI, 493 F.3d at 99).  Plaintiff is
correct that the Abstract states that ten NSCLC patients were among the forty-three patients
dosed, but provides response data for only seven patients — leading to the reasonable inference
that three additional NSCLC patients had been dosed.  Plaintiff strays into speculation, however,

---

[12]     Plaintiff's claims as to the correct ORR and DCR numbers run contrary to its own factual
assertions.  Plaintiff asserts that, because of the data of the three additional NSCLC
patients, "NextCure's ORR was not 27%, but really 15%, and its DCR was
not 71%, but rather 46%." (AC ¶ 49.)  However, if NextCure had data on ten NSCLC
patients, as Plaintiff alleges, for whom only two showed tumor response and five showed
a disease response, the ORR would be 20%, and the DCR would be 50%.

by assuming that those three patients were among the thirty-two patients whose tumor responses were declared evaluable in the Abstract.  As noted in the Abstract, among the forty-three patients enrolled were eleven whose tumor responses were not yet evaluable.  For Plaintiff to conclude from the Abstract that the three additional NSCLC patients were among the twenty-five others with an evaluable response, rather than among the eleven others without one, is exactly the type of "distorted inference" that is too speculative for the Court to credit, even on a motion to dismiss.

If Plaintiff is arguing that NextCure obtained data on the three additional NSCLC patients between August and November, her argument fails because the Abstract indicated the date through which the results were current and promised a timeline — subsequently honored — for disclosure of full results.  See ProNAi Therapeutics, 297 F. Supp. 3d at 401-402 (finding delayed disclosure of results of a clinical trial not to be actionably misleading where results were released "in line with . . . promised timing").  Here, although the Abstract was released on November 5, it made clear that its results were current only through the previous August, and that updated results would be released "at the conference" four days later.  (Abstract at 3.) Plaintiff seeks to elide these disclaimers by repeatedly framing the data as inaccurate "at the time of the misstatement" (i.e., November 5, the date of the Abstract's publication) (AC ¶ 49), but NextCure did not claim that the data was current through the date of publication.  Indeed, NextCure indicated that evaluation of the participants was ongoing.  Plaintiff's claim that NextCure was withholding data on three additional NSCLC patients is belied by the fact that NextCure, in the Abstract, stated that updated information would be provided at the upcoming conference.  To the extent that providing interim results for the Trial triggered a "duty to disclose

accurate current findings once they decided to report partial positive data," Defendants provided, and met, a rapid timeline (four days) for such disclosure.

        In either case, Plaintiff fails to plead plausibly that the Abstract is misleading.  It is replete with disclaimers as to the Trial's value in determining the efficacy of NC318.  See Kleinman v. Elan Corp., plc, 706 F.3d 145, 156 (2d Cir. 2013) (finding positive statements not to be misleading where they are accompanied by "note[s] of caution").  First, the Abstract makes clear that its results are from Phase 1 of NC318's clinical trial.  "Phase 1 studies . . . are designed to address safety, not efficacy."  ProNAi Therapeutics, 297 F. Supp. 3d at 401; see also Kleinman, 706 F.3d at 148 ("Phase 1 [of a clinical trial] consists of a closely monitored, relatively small study (twenty to eighty volunteers) to determine the safety of the drug and, if possible, early evidence of effectiveness." (citing 21 C.F.R. § 312.21(a))).  The Abstract is clear as to the study's design, purpose, and limitations.  It notes that the study is "open-label" and "non-randomized,"[13] and that its "[p]rimary endpoints include safety and tolerability[,]" whereas efficacy-related metrics are "secondary[.]"  (Abstract at 3.)  The purpose of the study, the Abstract states, is "to determine the safety and tolerability, define the maximum tolerated dose or pharmacologically active dose, and assess the preliminary efficacy of NC318."  (Id. (emphasis added).)  Plaintiff's contention that the abstract "paint[ed] a misleading picture of NC318's efficacy" (Pl. Mem. at 9) ignores the numerous indicators contained within the Abstract that any picture of NC318's efficacy painted by a study designed for safety was bound to be incomplete.

---

[13]      An "open label" trial is one in which participants and providers are "not blinded to the treatment allocation — that is, they [are] aware which treatment the participants [are] allocated."  Philip M. Sedgewick, What is an open label trial?, BMJ Clinical Research (May 23, 2014), https://www.researchgate.net/publication/262610232_What_is_an_open_label_trial.  Unlike a double blind randomized trial, "seen as the gold standard when assessing the effectiveness of treatments," an open trial is vulnerable to bias and distorted results.  Id.

Plaintiff proffers several other bases for her claim that the Abstract was misleading: that (1) the two NSCLC patients who "supposedly" demonstrated complete or partial responses were not biopsied prior to NC318 treatment, "meaning NextCure had no idea whether they were part of the patient population for which they would be seeking FDA approval" (AC ¶ 57); (2) the study protocol "routinely allowed enrollment of patients who had recently received other cancer treatments" (id. ¶ 58); and (3) characterization of the complete response, partial response, and incidence of stable disease as "durable" was not accurate because not enough time had elapsed to make that claim (id. ¶ 59).  In making these assertions, Plaintiff ignores both the regulatory context of the trial protocol and NextCure's own disclosures as to the primary endpoints of the study, which were unrelated to efficacy.  See supra at 17.  Plaintiff fails to plead why, in the Phase 1 context, failing to disclose whether the two patients who had demonstrated responses would be part of the FDA approval process could be considered misleading.  Plaintiff similarly fails to explain why the enrollment of patients who had received other treatments would be relevant to explaining a study in which safety and tolerability are primary endpoints.  Finally, Plaintiff's conclusory assertion that Defendants' use of the word "durable" to describe three responses is misleading fails because the Abstract disclosed the actual amount of time over which these responses had been observed.  (Artaki Decl., Ex. C.)  The Court accordingly concludes that Plaintiff has failed to plead a misstatement as to the Abstract.

<u>Expressions of "False Optimism" by Defendants, Made During and After November 2019</u>

Plaintiff's second set of claims arises from numerous statements made by NextCure and the Individual Defendants between November 5, 2019, and the end of the class period.  These statements can be summarized as positive characterizations of the Phase 1 Trial

data released on November 9 and inferences, based on this data, regarding NC318's potential as a new drug.  The following is a representative sampling of the statements, which are pled in paragraphs 50, 51, 60, 62, and 64 of the Amended Complaint:

- "The tolerability and initial anti-tumor activity with NC318 [from the Trial] reinforces our belief that NC318 has the potential to be a new therapy for patients with solid tumors . . .", made by Defendant Heller on November 9, 2019, in the November 9 Press Release.  (Artaki Decl., Exhibit F; see also AC ¶ 50.)

- "NC318, I believe has shown some very encouraging promise . . . we also are of course very encouraged by the confirmed responses in non-small cell lung, a couple of stable diseases that we saw in ovarian, head and neck, and breast," made by Defendant Heller on a November 9, 2019, analyst call.  (AC ¶ 51.)

- "[W]e have some preliminary data [referring to the Phase 1 Trial data] that suggests very strongly that [NC318] is active among patients who have PD-1 refractory non-small cell lung cancer," made by Defendant Richman on the same November 9, 2019 analyst call.  (AC ¶ 51.)

- NC318 has the "potential to treat multiple cancer indications," from the SPO Prospectus, dated November 12, 2019.  (AC ¶ 60.)

- "Looking at the responses a little bit more closely, NC318 demonstrated single-agent activity.  We saw durability of responses and stable disease.  We saw immune-related adverse events, but most important was this complete response," made by Def. Richman at a JPMorgan Healthcare Conference on January 16, 2020.  (AC ¶ 62.)

- Regarding the patient with the complete response, "the longer she was on NC318 and the further she was from the last PD-1 dose [] significantly supports that this was a

direct result of NC318," made by Def. Heller at a JPMorgan Healthcare Conference on January 16, 2020.  (AC ¶ 62.)

- "We believe NC318 has the potential to treat multiple cancer indications", from NextCure's Form 10-K, dated March 12, 2020.  (Artaki Decl. Ex. N, incorporated by reference in AC ¶ 64.)

In her opposition to the dismissal motion, Plaintiff claims that these statements were misleading because they "led investors to believe that the Phase I data was positive and that [NextCure] was moving toward Phase II for NSCLC when, in fact, they knew that [NextCure] was going to end the study."  (Pl. Mem. at 5.)  As Defendants note, however, this allegation is "conspicuously absent" from the Amended Complaint (docket entry no. 48 ("Reply") at 3) and therefore is not considered by the Court.  "[P]laintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments."  See, e.g., Louis v. New York City Hous. Auth., 152 F.Supp.3d 143, 158 (S.D.N.Y. Jan. 14, 2016) (quotation omitted); Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (explaining that pleadings may not be amended through a brief).  Moreover, even if Plaintiff had properly made these assertions in her complaint, they are insufficient to support a claim for fraud.  Because Plaintiff does not allege that Defendants actually promised a second phase of the Trial as to the NSCLC cohort, her claim that Defendants misled investors as to the possibility of a Phase II for NSCLC rests upon her assertions that Defendants "were fully aware that NC318 had hit a wall" and "knew that the [NextCure] was going to end the study."  (Pl. Mem. at 5.)  As Plaintiff pleads no facts in support of these assertions, her allegation is insufficient.  The court in In re Bemis Co. Sec. Litig. declined to credit similarly conclusory assertions:

> Here, Plaintiff alleges that Defendants 'were aware' of the alleged falsity of [their statements] 'by virtue of their positions with [their c]ompany.'

> The Amended Complaint pleads no other facts supporting an inference
> that Defendants had actual knowledge that any statements . . . were false.
> . . . Such conclusory assertions, without particularized facts giving rise to a
> strong inference of the requisite state of mind, are insufficient to plead
> actual knowledge that the [statements] were false or misleading.

512 F. Supp. 3d 518, 535 (S.D.N.Y. 2021).  Because Plaintiff's allegation that Defendants misled

investors as to the prospects of a Phase II trial rests on unsupported assertions of their

understanding of the factual context in which those assertions were made, this allegation would

not survive a motion to dismiss.

The allegations that are pled in the Amended Complaint also fall short.  Plaintiff

argues that the above-referenced statements "continued to create a positive impression of

NC318's effectiveness" when Defendants "knew the clinical trial data, at best, rendered NC318's

efficacy difficult to assess, including in patients suffering from NSCLC."  (AC ¶ 63.)  Efficacy

was difficult to assess, Plaintiff alleges, because "the trial was not designed to or even capable of

showing efficacy, while Defendants' statements cherry-picked the limited positive aspects of the

data and omitted critical caveats, in particular that the trial's design made it ill-suited to

demonstrating efficacy."  (AC ¶ 52.)

Defendants offer three arguments in response: (i) that these statements are non-

actionable corporate puffery (Def. Mem. at 13); (ii) that NextCure disclosed its Phase 1 trial

parameters, and investors could not therefore have been deceived by the Phase 1 data or the

conclusions NextCure drew from it (Def. Mem. at 14); and (iii) that some of the alleged

misstatements are "manufactured for litigation or misattributed to Defendants."  (Def. Mem. at

16.)

The Court agrees with Defendants that many of the statements constitute non-

actionable puffery.  Statements constitute non-actionable "puffery" when they are "vague

statements that no reasonable investor would rely upon."  Barilli v. Sky Solar Holdings, Ltd., 389
F. Supp. 3d 232, 253 (S.D.N.Y. 2019).  Mere "expressions of puffery and corporate optimism do
not give rise to securities violations."  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).  The
Second Circuit has "held that words like 'encouraging' are the type of 'expressions of puffery
and corporate optimism that do not generally give rise to securities violations.'"  Kleinman v.
Elan Corp., plc, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted) (holding that a headline in a
press release describing the results of a Phase 2 trial as "encouraging" was non-actionable
puffery).  Statements that "we believe NC318 has potential" or NC318 has shown "very
encouraging promise" are the sort of subjective, vaguely optimistic statements that no reasonable
investor would rely upon.  The Court accordingly dismisses Plaintiff's Exchange Act claims
arising from the statements identified in AC ¶ 50, AC ¶ 51, AC ¶ 60, and AC ¶ 64 as based on
non-actionable puffery.

Other statements made by Defendants cannot, however, be dismissed as mere
puffery.  While "there is no canonical test for how vague a statement must be to qualify as
puffery," Gross v. GFI Group, Inc., 162 F. Supp. 3d 263, 268 (S.D.N.Y. Feb. 9, 2016), statements
should not be dismissed as puffery unless they are "so obviously unimportant to a reasonable
investor that reasonable minds could not differ on the question of their importance."  IBEW Loc.
Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp. PLC, 783 F.3d
383, 389-90 (2d Cir. 2015).  The statements pled in AC ¶ 62, regarding responses of certain
individual trial participants, are sufficiently specific that their vagueness alone might not lead a
reasonable investor could deem them immaterial.

However, these statements are nonetheless non-actionable because a reasonable
investor would not, in light of information about the Phase 1 study that accompanied them,

consider them to have "altered the total mix of information affecting their investment decisions."
Ganino v. Citizen Utils. Co., 228 F.3d 154, 166 (2d Cir. 2000).  Plaintiff claims that Defendants'
positive characterizations of the data misled investors by representing that NC318 had shown
greater efficacy than the Phase 1 data, due to deficiencies in the trial design, could plausibly
show.  (AC ¶ 63.)  But Defendants argue, and the Court agrees, that Defendants had made
investors fully aware of the parameters of the Phase 1 trial, disclosing that many patients had not
been biopsied in advance (AC ¶ 51), that trial participants, including the patient who
demonstrated a complete response, had undergone other cancer treatments (AC ¶ 62), and that
Phase 1 was "not optimized . . . to look for efficacy" but was rather "all about safety and
tolerability and collecting as much data as possible so you can make a good educated guess for a
recommended phase 2 dose."  (AC ¶ 51.)  See In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869
(S.D.N.Y. 2015) (dismissing statements regarding the results of an allegedly defective trial when
the trial design had been disclosed).  These disclosures comport with the Phase 1 limitations
outlined by in 21 C.F.R. § 312.21(a).  While Defendant Heller's statement claiming that the data
"significantly supports" that the complete response of one individual was a "direct result" of
NC318 is undoubtedly optimistic the Court concludes, because investors had received all data
upon which it relied, that Plaintiff has not plausibly alleged that the statement, in the context of
Defendant's disclosures regarding the limitations of the Phase 1 study, significantly altered the
total mix of information, and thus has failed to plead sufficiently that the statement was material.
The Court accordingly dismisses all of Plaintiff's Exchange Act claims that are based on
statements made by Defendants regarding NC318 between November 5, 2019, and the end of the
class period.

<u>Defendants' Statements Regarding the FIND-IO Platform</u>

Plaintiff alleges that Defendants, in their IPO and SPO Prospectuses, falsely characterized the FIND-IO Platform as "unique" (AC ¶ 3), "novel" (AC ¶ 45), "proprietary" (<u>id.</u>), and "the result of our industrialization, expansion, and optimization of a predecessor platform that Dr. Chen used to discover the immunosuppressive properties of S15."  (AC ¶ 46.) Plaintiff claims that these assertions were false and misleading because Defendants did not disclose that "FIND-IO was built upon misappropriated confidential information and know-how" supplied by Richman from Immunaccel, allowing NextCure to "effectively copy[] Immunaccel's 3D technology."  (AC ¶ 69, <u>supra</u> at 8.)  As previously noted, Immunaccel had brought suit against Richman based on such allegations in February 2020, voluntarily dismissed its suit without payment of costs approximately four months later and subsequently, following the briefing of this motion, refiled the lawsuit against Richman.  (Artaki Decl. Ex. J, <u>supra</u> at 8; <u>see also</u> docket entry no. 52.)

These allegations fail to provide sufficient support for Plaintiff's fraud claim because recitations of unproven allegations made in other complaints do not, on their own, constitute factual allegations sufficient to survive a motion to dismiss.  <u>In re CRM Holdings, Ltd. Sec. Litig.</u>, No. 10-CV-975-RPP, 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012) ("As an initial matter, Plaintiff's citation to 'unproven allegations' made in [other complaints] do not constitute factual allegations." (citation omitted)).  "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have . . . not resolved, are, as a matter of law, immaterial within the meaning of Fed. R.C.P. 12(f)."  <u>RSM Prod. Corp. v. Fridman</u>, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009); <u>see also</u> <u>CRM Holdings</u>, 2012 WL 1646888, at *26 (ruling that Plaintiffs "may not rely on [unproven

allegations in other complaints] as evidence of . . . alleged fraud), <u>Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.</u>, 19-CV-7536-NRB, 2021 WL 1199035, at *12 (S.D.N.Y. 2021) ("[T]he prevailing view in this District is to disregard allegations that incorporate unproven allegations from complaints cited in other lawsuits.").  Here, Plaintiffs acknowledge in the Amended Complaint that they draw these allegations directly from Immunaccel's complaint against Richman.  (<u>See</u> AC ¶ 69 (explaining that the allegations pertaining to Immunaccel are being made "[a]ccording to Immunaccel's complaint").)  Plaintiff may not assert a viable claim for securities fraud by mere repetition of Immunaccel's unproven allegations.

Furthermore, even if the Court were to credit Plaintiff's allegations as to Richman's use of Immunaccel technology, Plaintiff has not pled plausibly that Defendants' characterization of the FIND-IO platform was misleading.  Defendants' descriptions of the FIND-IO platform as "unique" and "novel" are so vague as to constitute non-actionable puffery. <u>See</u> <u>Barilli</u>, 389 F. Supp. 3d at 253, <u>supra</u> at 19.  Plaintiff's conclusory allegations in the Amended Complaint that Richman used "proprietary information regarding Immunaccel's 3D assays and its 3D platform" and that NextCure "effectively copied" the Immunaccel technology (AC ¶ 69) to create the FIND-IO technology omit any explanation of what is meant by "effectively copying" and how the alleged use of unspecified confidential information renders NextCure's platform non-proprietary, and are attributed only to Immunaccel's complaint.  <u>Cf.</u> 15 U.S.C.A. § 78u-4(b)(1) ("if an allegation regarding the statement or omission is made on information and belief, the complaint shall state **with particularity** all facts on which that belief

is formed") (emphasis added).  All Exchange Act claims arising from Defendants' statements

regarding the FIND-IO Platform are therefore dismissed. [14]

Scienter

Plaintiff has also failed to plead the requisite strong inference of scienter: the

Amended Complaint does not allege facts (1) establishing motive and opportunity to commit

fraud; or (2) constituting strong circumstantial evidence of conscious misbehavior or

recklessness.  ATSI, 493 F.3d at 99, supra at 11.  Plaintiff does not attempt, and thus fails, to

allege any facts in the Amended Complaint to establish motive or opportunity to commit fraud.[15]

Regarding circumstantial evidence, Plaintiff's failure to plead facts supporting an

inference of Defendants' motive to defraud mandates imposition of a higher pleading standard,

which Plaintiff fails to meet.  "[W]here plaintiffs do not sufficiently allege that Defendants had a

motive to defraud the public, they 'must produce a stronger inference of recklessness.'"  Gregory

v. ProNAi Therapeutics Inc., 297 F. Supp. 3d 372, 395 (S.D.N.Y. 2018) (quoting Kalnit v.

Eichler, 264 F.3d 131, 143 (2d Cir. 2001)).  Defendants have acted recklessly if they "understood

that their public statements were inaccurate, or were 'highly unreasonable' in failing to

appreciate that possibility."  In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015).

---

[14]    As previously indicated, see supra at 9 n.11, Immunaccel's reinstatement of its action
against Richman and NextCure does not affect the Court's conclusion.  Immunaccel's
allegations remain unproven and the AC remains without any facts purporting to
corroborate or elaborate upon those allegations.  Furthermore, the allegations in the AC
(which Plaintiff does not seek to amend on the basis of this development) are
insufficiently specific to support the conclusion that Defendants' alleged omission was
misleading.

[15]    Plaintiff raises several new arguments regarding scienter in her opposition but, because
those arguments are not raised in the Amended Complaint and the Court has concluded
that Plaintiff fails to plead actionable misrepresentations, the Court does not consider or
address them.  Louis, 152 F. Supp. 3d at 158, supra at 20.

The Court finds that this standard has not been met.  Plaintiff has failed to plead that any of Defendants' statements were misleading, let alone demonstrably false, or that Defendants knew that any such statements were false when they made them.  Plaintiff thus fails to plead scienter. Because the first two elements of a 10(b) claim — that Defendants "(i) made an untrue statement of material fact, or omitted to state a material fact which made what was said, under the circumstances, misleading; and (2) defendants acted with scienter," S.E.C. v. Wyly, 117 F. Supp. 3d 381, 385 (S.D.N.Y. 2015) (citation omitted), have not been met by Plaintiff, the Court need not address the remaining elements of a claim for securities fraud under the Exchange Act.

Section 20 Liability

To plead a cause of action under Section 20 of the Exchange Act, Plaintiff must plead a primary violation under Section 10(b) of the same.  Finding no primary violation, the Court also dismisses all control person claims pursuant to Section 20 of the Exchange Act against all Defendants.  See Acticon AG v. China North East Petroleum Holdings LTD., 692 F.3d 34 (2d Cir. 2012).

Securities Act Claims

The Securities Act creates liability only for claims based on material misrepresentations or omissions in connection with a registered securities offering.  Section 11 applies to registration statements, while Section 12(a) covers prospectuses and oral communications.  See 15 U.S.C. §§ 77k(a), 77l(a)(2).  While the elements of scienter and reliance, need not be made out to state a claim under the Securities Act, plaintiffs must still plead the materiality of the alleged misstatement or omission.  "The definition of materiality is the same for these [Securities Act] provisions as it is under section 10(b) of the Exchange Act:

[W]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 376 (S.D.N.Y. 2011) (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010)) (alterations in original).

The statements pled in support of Plaintiff's claims under the Securities Act in the Amended Complaint are repetitive of those pled in connection with the Exchange Act and discussed above (see, e.g., AC ¶¶ 133-39 (characterizing as misleading Defendants' characterization of the FIND-IO Platform as "proprietary", "unique", and "novel"), AC ¶¶ 151, 159-60 (characterizing as misleading Defendants' failure to disclose that NC318 was "not effective").)  The Court has already found no material misstatements or omissions with regard to these statements.  Therefore, Plaintiff's Securities Act claims under sections 11 and 12(a) are dismissed.

Section 15 Liability

To plead a cause of action under Section 15 of the Securities Act, a plaintiff must allege an underlying violation of Sections 11 or 12 and that the defendant exercised the requisite control.  In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 185-86 (2d Cir. 2011). Because the Court has found no underlying Securities Act violations, Plaintiff's Section 15 claim is also dismissed.

<u>C<small>ONCLUSION</small></u>

For the foregoing reason, Defendants' motion to dismiss the Amended Complaint is granted.  This Memorandum Opinion and Order resolves docket entry no. 40.  The Clerk of Court is respectfully directed to enter judgment accordingly and close case no. 20-cv-7772.


SO ORDERED.

Dated: New York, New York
         July 12, 2023

                                                    /s/ Laura Taylor Swain
                                                    LAURA TAYLOR SWAIN
                                                    United States Chief District Judge